## CALIFORNIA *v.* AMERICAN STORES CO. ET AL.

No. 89–258.   Argued January 16, 1990—Decided April 30, 1990

272

STEVENS, J., delivered the opinion for a unanimous Court.  KENNEDY, J., filed a concurring opinion, *post*, p. 296.

*H. Chester Horn, Jr.*, Deputy Attorney General of California, argued the cause for petitioner.  With him on the briefs

were *John K. Van de Kamp*, Attorney General, *Andrea Sheridan Ordin*, Chief Assistant Attorney General, *Michael J. Strumwasser*, Special Assistant Attorney General, *Sanford N. Gruskin*, Assistant Attorney General, and *Lawrence R. Tapper* and *Ernest Martinez*, Deputy Attorneys General.

*Rex E. Lee* argued the cause for respondents. With him on the brief were *Carter G. Phillips, Mark D. Hopson, Donald B. Holbrook,* and *Kent T. Anderson.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Jim Mattox*, Attorney General of Texas, *Mary F. Keller*, First Assistant Attorney General, *Lou McCreary*, Executive Assistant Attorney General, *Allene D. Evans*, Assistant Attorney General, and *Donna L. Nelson*, Assistant Attorney General, *Don Siegelman*, Attorney General of Alabama, and *Walter S. Turner*, Chief Assistant Attorney General, *Douglas B. Baily*, Attorney General of Alaska, and *Thomas E. Wagner*, Assistant Attorney General, *John Steven Clark*, Attorney General of Arkansas, *Duane Woodard*, Attorney General of Colorado, *Clarine Nardi Riddle*, Attorney General of Connecticut, and *Robert M. Langer*, Assistant Attorney General, *Robert A. Butterworth*, Attorney General of Florida, and *Jerome W. Hoffman*, Assistant Attorney General, *Warren Price III*, Attorney General of Hawaii, and *Robert A. Marks* and *Ted Gamble Clause*, Deputy Attorneys General, *Jim Jones*, Attorney General of Idaho, and *Catherine K. Broad*, Deputy Attorney General, *Neil F. Hartigan*, Attorney General of Illinois, *Robert Ruiz*, Solicitor General, and *Christine H. Rosso*, Senior Assistant Attorney General, *Thomas J. Miller*, Attorney General of Iowa, and *John R. Perkins*, Deputy Attorney General, *Robert T. Stephan*, Attorney General of Kansas, *Frederic J. Cowan*, Attorney General of Kentucky, and *James M. Ringo*, Assistant Attorney General, *James E. Tierney*, Attorney General of Maine, and *Stephen L. Wessler*, Deputy Attorney General, *J. Joseph Curran, Jr.*, Attorney General of Maryland, and *Michael F. Brockmeyer* and *R. Hartman Roemer*, Assistant Attorneys General, *James M. Shannon*, Attorney General of Massachusetts, and *George K. Weber* and *Thomas M. Alpert*, Assistant Attorneys General, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Stephen P. Kilgriff*, Deputy Attorney General, *Thomas F. Pursell*, Assistant Attorney General, and *James P. Spencer*, Special Assistant Attorney General, *Brian McKay*, Attorney General of Nevada, and *J. Kenneth Creighton*, Deputy Attorney General, *Peter N. Perretti, Jr.*, Attorney General of New Jersey, and *Laurel A. Price*, Deputy Attorney General, *Robert Abrams*, Attorney General of New York, *O. Peter Sherwood*, Solic-

Justice Stevens delivered the opinion of the Court.

By merging with a major competitor, American Stores Co. (American) more than doubled the number of supermarkets that it owns in California. The State sued, claiming that the merger violates the federal antitrust laws and will harm consumers in 62 California cities. The complaint prayed for a preliminary injunction requiring American to operate the acquired stores separately until the case is decided, and then to divest itself of all of the acquired assets located in California. The District Court granted a preliminary injunction preventing American from integrating the operations of the two companies. The Court of Appeals for the Ninth Circuit agreed with the District Court's conclusion that California had made

itor General, and *Lloyd E. Constantine,* Assistant Attorney General, *Lacy H. Thornburg,* Attorney General of North Carolina, *James C. Gulick,* Special Deputy Attorney General, and *K. D. Sturgis,* Assistant Attorney General, *Anthony J. Celebrezze, Jr.,* Attorney General of Ohio, *Dave Frohnmayer,* Attorney General of Oregon, *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, *Eugene F. Waye,* Chief Deputy Attorney General, and *Carl S. Hisiro,* Senior Deputy Attorney General, *James E. O'Neil,* Attorney General of Rhode Island, and *Edmund F. Murray, Jr.,* Special Assistant Attorney General, *Roger A. Tellinghuisen,* Attorney General of South Dakota, and *Jeffrey P. Hallem,* Assistant Attorney General, *Charles W. Burson,* Attorney General of Tennessee, and *Perry Craft,* Deputy Attorney General, *Jeffrey L. Amestoy,* Attorney General of Vermont, and *Julie Brill,* Assistant Attorney General, *Mary Sue Terry,* Attorney General of Virginia, *Kenneth O. Eikenberry,* Attorney General of Washington, and *Carol A. Smith,* Assistant Attorney General, *Roger W. Tompkins,* Attorney General of West Virginia, *Daniel N. Huck,* Deputy Attorney General, and *Robert William Schulenberg III,* Senior Assistant Attorney General, and *Joseph B. Meyer,* Attorney General of Wyoming; and for the Center for Public Interest Law by *Robert C. Fellmeth.*

Briefs of *amici curiae* urging affirmance were filed for the Business Roundtable by *Thomas B. Leary* and *Janet L. McDavid;* for the California Retailers Association et al. by *Theodore B. Olson, James R. Martin, Phillip H. Rudolph,* and *Adrian A. Kragen;* and for the United Food and Commercial Workers International Union et al. by *George R. Murphy, Nicholas W. Clark, Robert W. Gilbert, Laurence D. Steinsapir,* and *D. William Heine.*

an adequate showing of probable success on the merits, but held that the relief granted by the District Court exceeded its authority under § 16 of the Clayton Act, 38 Stat. 737, as amended, 15 U. S. C. § 26. In its view, the "injunctive relief . . . against threatened loss or damage" authorized by § 16 does not encompass divestiture, and therefore the "indirect divestiture" effected by the preliminary injunction was impermissible. 872 F. 2d 837 (1989). We granted certiorari to resolve a conflict in the Circuits over whether divestiture is a form of injunctive relief within the meaning of § 16. 493 U. S. 916 (1989). We conclude that it is.

## I

American operates over 1,500 retail grocery stores in 40 States. Prior to the merger, its 252 stores in California made it the fourth largest supermarket chain in that State. Lucky Stores, Inc. (Lucky), which operated in seven Western and Midwestern States, was the largest, with 340 stores. The second and third largest, Von's Companies and Safeway Stores, were merged in December 1987. 697 F. Supp. 1125, 1127 (CD Cal. 1988); Pet. for Cert. 3.

On March 21, 1988, American notified the Federal Trade Commission (FTC) that it intended to acquire all of Lucky's outstanding stock for a price of $2.5 billion.[1] The FTC conducted an investigation and negotiated a settlement with American. On May 31, it simultaneously filed both a complaint alleging that the merger violated § 7 of the Clayton Act and a proposed consent order disposing of the § 7 charges subject to certain conditions. Among those conditions was a requirement that American comply with a "Hold Separate Agreement" preventing it from integrating the two companies' assets and operations until after it had divested itself of

---

[1] See 15 U. S. C. § 18a (Hart-Scott-Rodino Antitrust Improvements Act of 1976).

several designated supermarkets.[2] American accepted the terms of the FTC's consent order. In early June, it acquired and paid for Lucky's stock and consummated a Delaware "short form merger." 872 F. 2d, at 840; Brief for Respondents 2. Thus, as a matter of legal form American and Lucky were merged into a single corporate entity on June 9, 1988, but as a matter of practical fact their business operations have not yet been combined.

On August 31, 1988, the FTC gave its final approval to the merger. The next day California filed this action in the United States District Court for the Central District of California. The complaint alleged that the merger violated § 1 of the Sherman Act, 15 U. S. C. § 1, and § 7 of the Clayton Act, 15 U. S. C. § 18, and that the acquisition, "if consummated," would cause considerable loss and damage to the State: Competition and potential competition "in many relevant geographic markets will be eliminated," App. 61, and "the prices of food and non-food products might be increased." *Id.*, at 62. In its prayer for relief, California sought, *inter alia*, (1) a preliminary injunction "requiring American to hold and operate separately from American all of Lucky's California assets and businesses pending final adjudication of the merits"; (2) "such injunctive relief, including rescission . . . as is necessary and appropriate to prevent the effects" alleged in the complaint; and (3) "an injunction requiring American to divest itself of all of Lucky's assets and businesses in the State of California." *Id.*, at 65, 66–67.

---

[2] Among other requirements, the Hold Separate Agreement obligated American to maintain separate books and records for the acquisition; to prevent any waste or deterioration of the acquired company's California operation; to refrain from replacing the company's executives; to assure that it is maintained as a viable competitor in California; to refrain from selling or otherwise disposing of the acquired company's warehouse, distribution or manufacturing facilities, or any retail grocery stores in California; and to preserve separate purchasing for its retail grocery sales. 697 F. Supp. 1125, 1134 (CD Cal. 1988).

The District Court granted California's motion for a temporary restraining order and, after considering extensive statistical evidence, entered a preliminary injunction. Without reaching the Sherman Act claim, the court concluded that the State had proved a prima facie violation of § 7 of the Clayton Act. On the question of relief, the District Court found that the State had made an adequate showing "that Californians will be irreparably harmed if the proposed merger is completed," 697 F. Supp., at 1134, and that the harm the State would suffer if the merger was not enjoined "far outweighs" the harm that American will suffer as the result of an injunction. *Id.*, at 1135. The court also rejected American's argument that the requested relief was foreclosed by a prior decision of the Court of Appeals for the Ninth Circuit holding that divestiture is not a remedy authorized by § 16 of the Clayton Act. American contended that the proposed injunction was "tantamount to divestiture" since the merger of the two companies had already been completed, but the District Court disagreed. It held that since the FTC's Hold Separate Agreement was still in effect, the transaction was not a completed merger.[3]

American filed an interlocutory appeal pursuant to 28 U. S. C. § 1292(a)(1). The Court of Appeals for the Ninth Circuit first held that the District Court had not abused its discretion in finding that California had proved a likelihood of success on the merits and the probability of irreparable harm. Nevertheless, on the authority of its earlier decision in *International Telephone & Telegraph Corp.* v. *General Telephone & Electronics Corp.*, 518 F. 2d 913 (1975) *(IT&T)*,

---

[3] The District Court observed that because the Hold Separate Agreement was still in effect, "this is *not* a completed merger. [American] and Lucky, pursuant to the Hold Separate Agreement, are performing numerous functions as separate entities. They retain their separate names and with them their respective corporate identities." The court stated that only by completing a "linguistic triathalon" could one conclude that an injunction stopping such a merger was "tantamount to divestiture." 697 F. Supp., at 1134.

it set aside the injunction. The Court of Appeals reasoned that its own prior decisions established both that "'divestiture is not an available remedy in private actions under § 16 of the Clayton Act,'" and that "section 16 does not permit indirect divestiture, that is, an injunction which on its face does not order divestiture but which has the same effect. *IT&T*, 518 F. 2d at 924." 872 F. 2d, at 844. The Court of Appeals applied this rule to conclude that the injunction issued by the District Court was legally impermissible. Observing that under the injunction "these stores must operate as if Lucky had never been acquired by American Stores at all," the Court of Appeals held that "[s]uch an injunction requires indirect divestiture." *Id.*, at 845. Finally, the Court of Appeals added that the District Court had "compounded its misapprehension of the law of divestiture" by misunderstanding "the legal status of the merger." Specifically, the District Court erred by concluding that the "FTC's consent order" undid "the legal effect of this merger" which "had already taken place" according to Delaware corporation law. *Ibid.*

On California's application, JUSTICE O'CONNOR entered a stay continuing the District Court's injunction pending further review by this Court. 492 U. S. 1301 (1989). We then granted certiorari to resolve the conflict between this decision and the earlier holding of the Court of Appeals for the First Circuit in *CIA. Petrolera Caribe, Inc.* v. *Arco Caribbean, Inc.*, 754 F. 2d 404 (1985). We now reverse.

## II

In its *IT&T* opinion, the Court of Appeals for the Ninth Circuit reasoned that the term "injunctive relief" as used in § 16 is ambiguous and that it is necessary to review the statute's legislative history to determine whether it includes divestiture. Then, based on its reading of a colloquy during a hearing before a subcommittee of the Judiciary Committee of the House of Representatives, it concluded that the draftsmen of the bill did not intend to authorize the remedies of

"dissolution" or "divestiture" in actions brought by private litigants. 518 F. 2d, at 921–922. The Court of Appeals for the First Circuit has rejected that reasoning. It found instead that a fair reading of the statutory text, buttressed by recognized canons of construction,[4] required a construction of the words "injunctive relief" broad enough to encompass divestiture. Moreover, it doubted whether the references to "dissolution" in the legislative history referred to "divestiture," and did not consider this evidence sufficiently probative, in any event, to justify a restrictive reading of the Act that seemed inconsistent with its basic policy. 754 F. 2d, at 415–428.

American endorses the analysis of the Court of Appeals for the Ninth Circuit, but places greater reliance on two additional arguments. First, it argues that there is a significant difference between the text of § 15 of the Act, which authorizes equitable relief in actions brought by the United States, and the text of § 16, which applies to other parties. Specifically, it argues that the former is broad enough to encourage "structural relief" whereas the latter is limited to relief against anticompetitive "conduct." Second, reading § 16 in its historical context, American argues that it reflects a well-accepted distinction between prohibitory injunctions (which are authorized) and mandatory injunctions (which, American argues, are not).

American's argument directs us to two provisions in the statutory text, and that is the natural place to begin our analysis. Section 15 grants the federal district courts jurisdiction "to prevent and restrain violations of this Act" when

---

[4] The Court of Appeals observed:

"Although we have no way of definitively determining the congressional intent in passing § 16, there remains at least one secure guidepost: when Congress uses broad generalized language in a remedial statute, and that language is not contravened by authoritative legislative history, a court should interpret the provision generously so as to effectuate the important congressional goals." *CIA. Petrolera Caribe, Inc.* v. *Arco Caribbean, Inc.*, 754 F. 2d 404, 428 (1985).

United States attorneys "institute proceedings in equity to prevent and restrain such violations" through petitions "praying that such violation shall be enjoined or otherwise prohibited."[5] Section 16 entitles "[a]ny person, firm, corporation, or association . . . to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity."[6]

It is agreed that the general language of § 15, which provides that antitrust violations "shall be enjoined or otherwise prohibited," is broad enough to authorize divestiture. Indeed, in Government actions divestiture is the preferred

---

[5] The section provides in pertinent part:

"The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of this Act, and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition, the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition, and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises. . . ." 15 U. S. C. § 25.

[6] The section provides in pertinent part:

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss of damage is immediate, a preliminary injunction may issue . . . ." 15 U. S. C. § 26.

remedy for an illegal merger or acquisition. As we wrote in the *Du Pont* case:

"Divestiture or dissolution has traditionally been the remedy for Sherman Act violations whose heart is intercorporate combination and control, and it is reasonable to think immediately of the same remedy when § 7 of the Clayton Act, which particularizes the Sherman Act standard of illegality, is involved. Of the very few litigated § 7 cases which have been reported, most decreed divestiture as a matter of course. Divestiture has been called the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found." *United States* v. *E. I. du Pont de Nemours & Co.*, 366 U. S. 316, 329–331 (1961) (footnotes omitted).

On its face, the simple grant of authority in § 16 to "have injunctive relief" would seem to encompass divestiture just as plainly as the comparable language in § 15. Certainly § 16's reference to "injunctive relief . . . against threatened loss or damage" differs from § 15's grant of jurisdiction to "prevent and restrain violations," but it obviously does not follow that one grant encompasses remedies excluded from the other.[7] Indeed, we think it could plausibly be argued that § 16's terms are the more expansive. In any event, however, as the Court of Appeals for the First Circuit correctly observed, § 16 "states no restrictions or exceptions to the forms of injunctive relief a private plaintiff may seek, or that a court may order. . . . Rather, the statutory language indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief." 754 F. 2d, at

---

[7] That the two provisions do differ is not surprising at all, since § 15 was largely copied from § 4 of the Sherman Act, see 26 Stat. 209, ch. 647, 15 U. S. C. § 4, while § 16, which had to incorporate standing limits appropriate to private actions—see *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U. S. 104 (1986)—had no counterpart in the Sherman Act.

416. We agree that the plain text of § 16 authorizes divestiture decrees to remedy § 7 violations.

American rests its contrary argument upon two phrases in § 16 that arguably narrow its scope. The entitlement "to sue for and have injunctive relief" affords relief "against threatened loss or damage by a violation of the antitrust laws." Moreover, the right to such relief exists "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity. . . ."

In this case, however, the requirement of "threatened loss or damage" is unquestionably satisfied. The allegations of the complaint, the findings of the District Court, and the opinion of the Court of Appeals all assume that even if the merger is a completed violation of law, the threatened harm to California consumers persists. If divestiture is an appropriate means of preventing that harm, the statutory reference to "threatened loss or damage" surely does not negate the court's power to grant such relief.[8]

The second phrase, which refers to "threatened conduct that will cause loss or damage," is not drafted as a limitation on the power to grant relief, but rather is a part of the general reference to the standards that should be applied in fashioning injunctive relief. It is surely not the equivalent of a directive stating that unlawful conduct may be prohibited but structural relief may not be mandated. Indeed, as the Ninth Circuit's analysis of the issue demonstrates, the distinction between conduct and structure—or between prohibitory and mandatory relief—is illusory in a case of this kind. Thus, in the *IT&T* case the court recognized that an injunction prohib-

---

[8] Indeed, the evident import of Congress' reference to *"threatened* loss or damage" is not to constrict the availability of injunctive remedies against violations that have already begun or occurred, but rather to expand their availability against harms that are as yet unrealized. See *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 130, and n. 24 (1969).

iting the parent company from voting the stock of the subsidiary should not be treated differently from a mandatory order of divestiture.[9]   And in this case the court treated the Hold Separate Agreement as a form of "indirect divestiture."   In both cases the injunctive relief would unquestionably prohibit "conduct" by the defendants.   American's textual arguments—which rely on a distinction between mandatory and prohibitive relief—do not explain why such remedies would not be appropriate.[10]

If we assume that the merger violated the antitrust laws, and if we agree with the District Court's finding that the conduct of the merged enterprise threatens economic harm to California consumers, the literal text of § 16 is plainly sufficient to authorize injunctive relief, including an order of divestiture, that will prohibit that conduct from causing that harm.   This interpretation is consistent with our precedents, which have upheld injunctions issued pursuant to § 16 regardless of whether they were mandatory or prohibitory in character.   See *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 129–133 (1969) (reinstating injunction that required defendants to withdraw from patent pools); see also *Silver* v. *New York Stock Exchange*, 373 U. S. 341, 345, 365 (1963) (reinstating judgment for defendants in suit to compel

---

[9] The District Court in the *IT&T* case had observed that " '[i]f it were necessary to strain terminology in order to accomplish the same result, a court could easily phrase a "negative injunction" in such terms as to enjoin the activities of a corporation to such a degree that divestiture would be the only economical choice available to that corporation.' "   518 F. 2d, at 924.   The Court of Appeals admitted the force of this observation, agreeing with the District Court that the *Standard Oil* dissolution decree, *Standard Oil Co. of New Jersey* v. *United States,* 221 U. S. 1, 78 (1911), served as an example of an " 'indirect' divestiture decre[e]."   518 F. 2d, at 924.

[10] Notably, the Court of Appeals for the Ninth Circuit did not rely on either of the textual arguments that American has advanced here.   Had it done so, it would have been forced to acknowledge a distinction between direct divestiture and indirect divestiture.

installation of wire services). We have recognized when construing § 16 that it was enacted "not merely to provide private relief, but . . . to serve as well the high purpose of enforcing the antitrust laws." *Zenith Radio Corp.*, 395 U. S., at 130–131. We have accordingly applied the section "with this purpose in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice 'adjustment and reconciliation between the public interest and private needs as well as between competing private claims.'" *Ibid.*, quoting *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329–330 (1944).

Finally, by construing § 16 to encompass divestiture decrees we are better able than is American to harmonize the section with its statutory context. The Act's other provisions manifest a clear intent to encourage vigorous private litigation against anticompetitive mergers. Section 7 itself creates a relatively expansive definition of antitrust liability: To show that a merger is unlawful, a plaintiff need only prove that its effect *"may be* substantially to lessen competition." Clayton Act § 7, 38 Stat. 731, 15 U. S. C. § 18 (emphasis supplied). See *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 323 (1962). In addition, § 5 of the Act provided that during the pendency of a Government action, the statute of limitations for private actions would be tolled. The section also permitted plaintiffs to use the final judgment in a Government antitrust suit as prima facie evidence of liability in a later civil suit. Private enforcement of the Act was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition. See *Minnesota Mining & Mfg. Co.* v. *New Jersey Wood Finishing Co.*, 381 U. S. 311, 318 (1965). Congress also made express its view that divestiture was the most suitable remedy in a suit for relief from a § 7 violation: In § 11 of the Act, Congress directed the FTC to issue orders requiring that a violator of § 7 "cease and desist from the violation," and, specifically, that the violator

"divest itself of the stock held" in violation of the Act.[11]    Section 16, construed to authorize a private divestiture remedy when appropriate in light of equitable principles, fits well in a statutory scheme that favors private enforcement, subjects mergers to searching scrutiny, and regards divestiture as the remedy best suited to redress the ills of an anticompetitive merger.

## III

Although we do not believe the statutory language is ambiguous, we nonetheless consider the legislative history that persuaded the Ninth Circuit to place a narrow construction on § 16.    To understand that history, however, it is necessary to place the statute in its historical perspective.

The Sherman Act became law just a century ago.    It matured some 15 years later, when, under the administation of Theodore Roosevelt, the Sherman Act "was finally being used against trusts of the dimension that had called it into

---

[11] In the context of construing the FTC's authority to issue such "cease and desist" orders, this Court—speaking through Justice McReynolds, who had served as President Wilson's chief antitrust enforcement officer at the time the Clayton Act was framed—had no difficulty finding that the continuing ownership of stock unlawfully acquired was itself a continuing violation of the Act:

"The order here questioned was entered when respondent actually held and owned the stock contrary to law.    The Commission's duty was to prevent the continuance of this unlawful action by an order directing that it cease and desist therefrom and divest itself of what it had no right to hold.    Further violations of the Act through continued ownership could be effectively prevented *only by requiring the owner wholly to divest itself of the stock* and thus render possible once more free play of the competition which had been wrongfully suppressed." *FTC* v. *Western Meat Co.*, 272 U. S. 554, 559 (1926).

The suggestion that continuing ownership of stock unlawfully acquired might constitute a "further violatio[n] of the Act" would cast some doubt upon the utility of American's distinction between mandatory and prohibitory injunctions even were we inclined to accept the relevance of that distinction.    As we reject the distinction, we have, however, no cause to pursue this line of inquiry further.

being, and with enough energy to justify the boast that the President was using a Big Stick." W. Letwin, Law and Economic Policy in America 240 (1965). Two of the most famous prosecutions concluded in 1911, with decisions from this Court endorsing the "Rule of Reason" as the principal guide to the construction of the Sherman Act's general language. *Standard Oil Co. of New Jersey* v. *United States*, 221 U. S. 1; *United States* v. *American Tobacco Co.*, 221 U. S. 106. In consequence of the violations found in those two cases, wide-ranging injunctions were entered requiring the separation of the "oil trust" and the "tobacco trust" into a number of independent, but still significant, companies. The relief granted received mixed reviews. In some quarters, the cases were hailed as great triumphs over the forces of monopoly; in others, they were regarded as Pyrrhic victories.[12]

Concern about the adequacy of the Sherman Act's prohibition against combinations in restraint of trade prompted President Wilson to make a special address to Congress in 1914 recommending that the antitrust laws be strengthened. 2 The New Democracy, The Public Papers of Woodrow Wilson 81–89 (R. Baker & W. Dodd eds. 1926). Congressman Clayton, the Chairman of the House Judiciary Committee, promptly appointed a subcommittee to prepare the legislation. The bill drafted by the subcommittee contained most of the provisions that were eventually enacted into the law now known as the Clayton Act. The statute reenacted certain provisions of the Sherman Act and added new provisions of both a substantive and procedural character. Letwin,

---

[12] The Taft Administration received the decisions warmly, but they provoked bitter criticism from the Democratic Party leadership. Antitrust policy was sharply debated during the 1912 Presidential campaign. See W. Letwin, Law and Economic Policy in America 266, 269 (1965). Upon becoming Woodrow Wilson's first Attorney General shortly thereafter, James McReynolds promised to deliver dissolutions "free from the fundamental defect in the plans adopted in the Standard Oil and Tobacco cases where the separate parts into which the business was divided were left under the control of the same stockholders." Annual Report of Attorney General, H. R. Doc. No. 460, 63d Cong., 2d Sess., 7 (1913).

Law and Economic Policy in America, at 272–273; 2 A. Link,
Wilson: The New Freedom 426 (1956). Thus, § 4 of the Sher-
man Act, which authorizes equitable relief in actions brought
by the United States, was reenacted as § 15 of the Clayton
Act, while § 16 filled a gap in the Sherman Act by authorizing
equitable relief in private actions. Section 7 of the Clayton
Act made stock acquisitions of competing companies more
vulnerable, and §§ 4 and 5 gave special procedural advan-
tages to private litigants. The reform project had broad so-
cial significance, and it is obvious that the Act as a whole is
fairly characterized as important remedial legislation.

Some proponents of reform, however, were critical of the
bill for not going further. Thus, for example, proposals that
were never enacted would have expressly authorized private
individuals to bring suit for the dissolution of corpora-
tions adjudged to have violated the law and for appointment
of receivers to wind up the corporation's affairs.[13] Sam-
uel Untermyer, a New York lawyer who urged Congress
to give private plaintiffs express authority to seek dissolu-
tion decrees, stated his views in a colloquy with Congress-
man John Floyd during a hearing on the bill before the House
Judiciary Committee. Floyd told Untermyer that "We did
not intend by section 13 to give the individual the same
power to bring a suit to dissolve the corporation that
the Government has," and added that the committee Mem-

---

[13] An amendment passed by the Senate, but rejected by the House,
provided:

"That whenever a corporation shall acquire or consolidate the ownership
or control of the plants, franchises, or property of other corporations, co-
partnerships, or individuals, so that it shall be adjudged to be a monopoly
or combination in restraint of trade, the court rendering such judgment
shall decree its dissolution and shall to that end appoint receivers to wind
up its affairs and shall cause all of its assets to be sold in such manner and
to such persons as will, in the opinion of the court, restore competition as
fully and completely as it was before said corporation or combination began
to be formed. The court shall reserve in its decree jurisdiction over said
assets so sold for a sufficient time to satisfy the court that full and free com-
petition is restored and assured." 51 Cong. Rec. 15863 (1914).

bers had discussed the matter very thoroughly. Untermyer replied that "the very relief that the man needs nine times out of ten is the dissolution of the corporation, because . . . it may not be doing any specific act of illegality, but its very existence, in violation of law, is the thing that is injuring him." Hearings on Trust Legislation before the House Committee on the Judiciary, 63d Cong., 2d Sess., 842–846 (1914) (House Hearings).

Two weeks later, Louis Brandeis, testifying on behalf of the administration before the same committee, was asked whether he favored a proposal "to give the individual the right to file a bill in equity for the dissolution of one of these combinations, the same right which the Government now has and which it is its duty to perform." Brandeis responded that the proposal was not sound and added:

> "It seems to me that the right to change the status [of the combination], which is the right of dissolution, is a right which ought to be exercised only by the Government, although the right for full redress for grievances and protection against future wrongs is a right which every individual ought to enjoy.
>
> "Now, all of this procedure ought to be made so as to facilitate, so far as possible, the enforcement of the law in aid, on the one hand, of the Government, and in aid, on the other hand, of the individual. But that fundamental principle is correct, that the Government ought to have the right, and the sole right, to determine whether the circumstances are such as to call for a dissolution of an alleged trust." *Id.*, at 649–650.

American relies on these exchanges to support two slightly different arguments. First, it suggests that the committee recognized a distinction between relief directed at conduct and relief that is designed to change a company's status or structure. Second, it suggests that Congressman Floyd's statements permit an inference that the Congress as a whole rejected the possibility of a private dissolution remedy, and

thereby rejected divestiture as well, because divestiture is a species of dissolution.   Neither suggestion is persuasive.

We have already concluded that the suggested distinction between divestiture and injunctions that prohibit future conduct is illusory.   These excerpts, moreover, from the legislative history provide even less support for such a categorical distinction than does the text of § 16 itself.

The flaw in American's second suggestion is its assumption that the dissolution proposals submitted to Congress contemplated nothing more extreme than divestiture.   Dissolution could be considerably more awesome.   As the New York Court of Appeals ominously declared before affirming a decree against the North River Sugar Refining Company, dissolution was a "judgment . . . of corporate death," which "represent[ed] the extreme rigor of the law." [14]   This meaning is evident from the text of the Senate amendment proposing private dissolution suits, which provided for a receiver to administer the doomed corporation's assets. [15]

---

[14] *People* v. *North River Sugar Refining Co.*, 121 N. Y. 582, 608, 24 N. E. 834 (1890).   The New York attorney general had sought dissolution of the company for its participation in the sugar trust, relying upon two theories: that dissolution was appropriate because the company had violated the terms of its charter by entering the trust, and that dissolution was appropriate under the state antitrust laws.   The Court of Appeals agreed that dissolution was appropriate on the first ground, and so declined to reach the second.   *Id.*, at 626, 24 N. E., at 841.

Judge Finch, writing for a unanimous court, began the opinion by announcing: "The judgment sought against the defendant is one of corporate death."   *Id.*, at 608, 24 N. E., at 834.   He then said that although the "life of a corporation is indeed less than that of the humblest citizen," "destruction of the corporate life" may not be effected "without clear and abundant reason."   *Ibid.*   The ensuing opinion bristles with the rhetoric of moral condemnation; when characterizing the corporation's defense, for example, Judge Finch commented that the court had been asked "to separate in our thought the soul from the body, and admitting the sins of the latter to adjudge that the former remains pure."   *Id.*, at 626, 24 N. E., at 837.

[15] See n. 13, *supra*.   Senator Reed, the sponsor of the Senate amendment which would have expressly authorized dissolution proceedings, stated that the statute's dissolution remedy should guarantee that "we

The concept of dissolution, of course, also encompassed remedies comparable to divestiture, or to our present-day understanding of dissolution.[16] It was one thing to dissolve a

shall have a real decree, that there shall be a real burial, and that we shall sod down the grave upon the monster that was created in defiance of law, but that we shall at the same time preserve its parts and restore them to competition and activity . . . ." 51 Cong. Rec. 15864 (1914).

[16] There is a common core to present-day and early 20th-century understandings of the distinction between dissolution and divestiture:

"As applied in both early and more recent antitrust cases, 'dissolution' refers to an antitrust judgment which dissolves or terminates an illegal combination or association—putting it out of business, so to speak. 'Divestiture' is used to refer to situations where the defendants are required to divest or dispossess themselves of specified property in physical facilities, securities, or other assets." Oppenheim, Divestiture as a Remedy Under the Federal Antitrust Laws, 19 Geo. Wash. L. Rev. 119, 120 (1950).

Nevertheless, for at least the past four decades dissolution and divestiture have been treated as interchangeable terms in antitrust law. See *United States* v. *E. I. du Pont de Nemours & Co.*, 366 U. S. 316, 330, n. 11 (1961) (terms are to a "large degree interchangeable"); see also Oppenheim, 19 Geo. Wash. L. Rev., at 121 (recognizing technical distinction between terms, but treating them as interchangeable nonetheless).

During the first decades of this century, however, "dissolution" was the favored term for a remedy that put an end to an unlawful combination and "divestiture" was rarely mentioned in the antitrust context. The early 20th-century treatise writers seem to have spoken exclusively in terms of dissolution. See, *e. g.*, W. Thornton, A Treatise on the Sherman Anti-Trust Act § 372 (1913). Not surprisingly, all of the legislative history cited by the parties to this case refers to dissolution, not to divestiture.

Yet even without using the term "divestiture," Congress could and did recognize the appropriateness of a divestiture remedy in merger cases: § 11 of the Clayton Act expressly authorizes the FTC to order a defendant corporation to "divest itself of the stock held . . . contrary to the provisions of sectio[n] seven . . . of this Act." 38 Stat. 735. Indeed, the term "divestiture" appears to have entered the antitrust vocabulary as a consequence of FTC proceedings against alleged violators of § 7 of the Act. See, *e. g.*, *Arrow-Hart & Hegeman Electric Co.* v. *FTC*, 291 U. S. 587 (1934); *FTC* v. *Western Meat Co.*, 272 U. S. 554 (1926). Use of the term in those cases is unsurprising, for the text of the Act suggested that "divestiture," rather than "dissolution," was the remedy being sought.

By 1944, Justice Douglas was using the two terms in close proximity, see *United States* v. *Crescent Amusement Co.*, 323 U. S. 173, 188–189 (1944)

pool, trust, combination, or merger, and quite another to atomize, or to revoke the charter of, a large corporation.[17] In the early part of this century, however, new forms of corporate organization were arising at a pace that outstripped the vocabulary used to describe them.[18] Concern about monopoly and competition dominated domestic politics, but people disagreed about what these things were, and about why, and to what extent, they were good or bad.[19] Men like McReynolds, Wilson's Attorney General, and Brandeis, the President's chief adviser on antitrust policy, could concur upon the need for forceful antitrust legislation and prosecution while finding themselves parted—as their later battles on this Court made clear—by a vast gulf in their understandings of economic theory and marketplace ethics.[20] Absent

(Sherman Act case), although it is at least arguable that his usage preserved the technical distinction that was to be generally elided less than a decade later. Cf. *Swift & Co.* v. *United States*, 276 U. S. 311, 319 (1928) (referring to "divestiture of the instrumentalities" in a case raising both Sherman Act and Clayton Act claims). It would appear that, as the moral conception of dissolution lost favor and divestiture decrees became paradigmatic of dissolution remedies, the two concepts were collapsed into one another.

[17] For discussion of the scope of various dissolution decrees entered pursuant to the federal antitrust laws, see Hale, Trust Dissolution: "Atomizing" Business Units of Monopolistic Size, 40 Colum. L. Rev. 615 (1940); Adams, Dissolution, Divorcement, Divestiture: The Pyrrhic Victories of Antitrust, 27 Ind. L. J. 1 (1951). See also 2 A. Link, Wilson: The New Freedom 417–423 (1956).

[18] See, *e. g.*, H. Thorelli, The Federal Antitrust Policy 72–87 (1954). Thorelli observes that "[n]o general incorporation law before 1888 explicitly sanctioned intercorporate stockholdings; some state laws even explicitly forbade them in the absence of special permission by the legislature. Common law rules did not recognize such relationships between corporations." *Id.*, at 83. Perhaps because of the rapid pace of developments in corporate law, the politically charged "trust" concept came to embrace any large corporate combination as well as one specific device for creating such combinations. *Id.*, at 84–85. See also D. Martin, Mergers and the Clayton Act 15, 43 (1959).

[19] See, *e. g.*, Thorelli, The Federal Antitrust Policy, at 108–163, 309–352.

[20] See 2 Link, Wilson: The New Freedom, at 117, n. 83.

agreement on the terms of debate, dissolution could mean the corporate death sentence, or the decrees of the *Standard Oil* and *American Tobacco* cases, or something else.[21]    So long as this ambiguity persisted, dissolution had to be considered a public remedy, one that encompassed a power peculiarly suited to transgressions so "material and serious" as to "harm or menace the public welfare" in a manner transcending the "quarrels of private litigants."[22]    For those like Brandeis, who viewed dissolution as desirable only if treated not as a moral penalty but rather as a necessary economic remedy,[23] it would be imprudent to allow private parties to control a weapon potentially so lethal.    Although it may now be second nature to conceive of dissolution in economic terms compatible with the policy Brandeis championed,[24] this view was anything but uncontroversial when the Act was drafted.[25]

Once the historical importance of the distinction between dissolution and divestiture is understood, American's argument from the legislative history becomes singularly unpersuasive.    The rejection of a proposed remedy that would terminate the corporate existence of American and appoint a

---

[21] See *CIA. Petrolera Caribe, Inc.*, 754 F. 2d, at 419–422.

[22] *North River Sugar Refining Co.*, 121 N. Y., at 609, 24 N. E., at 835.

[23] "[Brandeis] believed that anti-trust policy should be constructive rather than destructive: '. . . we should approach this subject from the point of view of regulation rather than of restriction; because industrial crime is not a cause, it is an effect—the effect of a bad system.'" A. Mason, Brandeis: A Free Man's Life 402 (1956) (footnote omitted).

[24] Cf. *United States* v. *E. I. du Pont de Nemours & Co.*, 366 U. S., at 326 ("divestiture" is the "most drastic, but most effective, of antitrust remedies," yet it should be imposed only to "restore competition" and must not be "punitive").    See also Comment, The Personification of the Business Corporation in American Law, 54 U. Chi. L. Rev. 1441, 1478–1483 (1987) (discussing decline of moral conceptions of the corporation).

[25] The notion that a proper remedy for violating the antitrust laws is complete dissolution of the wrongdoer persists in some state antitrust statutes that allow termination of a foreign corporation's right to do business within the State when the corporation is found guilty of violating the law. See, *e. g.*, Wis. Stat. § 133.12 (1987–1988).

receiver to supervise the disposition of its assets is surely not the equivalent of the rejection of a remedy that would merely rescind a purchase of stock or assets. Dissolution was too vague and ill defined a remedy to be either incorporated into or excluded from § 16 as such; Congress instead sensibly avoided the problematic word and spoke in terms of equitable relief drawn to redress damage or loss which a private party might suffer by consequence of the Act's violation.[26] That divestiture was encompassed within the concept of dissolution as understood at the time of the Clayton Act's framing does not imply that the equitable formulation of § 16 cannot permit divestiture while excluding more severe sanctions that also traveled under the name "dissolution."

For similar reasons, we need not consider how much weight might otherwise be due to *Graves* v. *Cambria Steel Co.*, 298 F. 761 (NY 1924), a brief District Court decision by Judge Learned Hand upon which American relies heavily.[27] The suit appears to have been brought by dissatisfied shareholders of a target corporation who wished to dissolve the new merged entity. The plaintiffs sought relief

---

[26] Congress could, of course, have referred expressly to the divestiture remedy, as was done in § 11 of the Act, directing that the FTC shall require a violator of § 7 to "divest itself of the stock" unlawfully acquired. There was, however, no reason for Congress to itemize the various remedies which might be available in a § 16 suit. Moreover, while divestiture might be the appropriate remedy in every § 7 case prosecuted by the FTC, there is no reason to believe that the same would be true in private § 7 cases. There is thus nothing remarkable about the absence of any specific reference to divestiture in § 16.

[27] American also seeks to buttress its position by citations to *Fleitmann* v. *Welsbach Co.*, 240 U. S. 27 (1916); *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443 (1921); *General Investment Co.* v. *Lake Shore & M. S. R. Co.*, 260 U. S. 261, 287 (1922); *Continental Securities Co.* v. *Michigan Cent. R. Co.*, 16 F. 2d 378 (CA6 1926), cert. denied, 274 U. S. 741 (1927); and *Venner* v. *Pennsylvania Steel Co. of New Jersey*, 250 F. 292 (NJ 1918). Several of these cases seem to us to involve issues entirely distinct from those posed here, and, in any event, in none of these precedents do we find anything that casts any doubt upon the rule we announce today.

under § 16 of the Clayton Act. Judge Hand remarked that the suit "is really a suit for the dissolution of a monopoly pro tanto. I cannot suppose that any one would argue that a private suit for dissolution would lie under section 16 of the Clayton Act." 298 F., at 762. Not only does Hand, like Floyd, Untermyer, and Brandeis before him, refer to dissolution rather than divestiture, but, moreover, the state corporation law overtones of the inchoate complaint make it possible that the suit implicated the more drastic forms of dissolution.

The inferences that American draws from its excerpts from the subcommittee hearings simply are not confirmed by anything that has been called to our attention in the Committee Reports, the floor debates, the Conference Report, or contemporaneous judicial interpretations.[28] Indeed, a fair reading of the entire legislative history supports the conclusion that § 16 means exactly what it says when it endorses the "conditions and principles" governing injunctive relief in courts of equity: that the provision should be construed generously and flexibly pursuant to principles of equity. See

---

[28] Professors Areeda and Turner have criticized the Court of Appeals for the Ninth Circuit on the ground that it did not correctly evaluate the legislative history of § 16 in *IT&T*. Areeda and Turner state that the "fragment of legislative history" relied upon by the Court of Appeals "cannot bear the weight the court placed upon it, when the reports of the relevant House and Senate committees were silent on the point, which also did not appear to have been mentioned on the House or Senate floor." They point out that "other courts have indicated, correctly, that divestiture is available in a private suit challenging unlawful mergers," and conclude that "divestiture is the normal and usual remedy against an unlawful merger, whether sued by the government or by a private plaintiff." 2 P. Areeda & D. Turner, Antitrust Law § 328b (1978) (footnotes omitted). Other commentators have likewise reasoned that § 16 affords private plaintiffs a divestiture remedy. See, *e. g.*, Peacock, Private Divestiture Suits Under Section 16 of the Clayton Act, 48 Tex. L. Rev. 54 (1969); Note, Availability of Divestiture in Private Litigation as a Remedy for Violation of Section 7 of the Clayton Act, 49 Minn. L. Rev. 267 (1964); Note, Divestiture as a Remedy in Private Actions Brought Under Section 16 of the Clayton Act, 84 Mich. L. Rev. 1579 (1986).

*CIA. Petrolera Caribe, Inc.*, 754 F. 2d, at 418–427. As the Court stated in *Hecht Co.* v. *Bowles*, 321 U. S., at 329:

> "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it."

More recently, in *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 313 (1982), we observed that when Congress endows the federal courts with equitable jurisdiction, Congress acts aware of this longstanding tradition of flexibility. "'Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.'" *Ibid.*, quoting *Porter* v. *Warner Holding Co.*, 328 U. S. 395, 398 (1946). These principles unquestionably support a construction of the statute that will enable a chancellor to impose the most effective, usual and straightforward remedy to rescind an unlawful purchase of stock or assets. The fact that the term "divestiture" is used to describe what is typically nothing more than the familiar remedy of rescission does not place the remedy beyond the normal reach of the chancellor.

## IV

Our conclusion that a district court has the power to order divestiture in appropriate cases brought under § 16 of the Clayton Act does not, of course, mean that such power should be exercised in every situation in which the Government would be entitled to such relief under § 15. In a Government case the proof of the violation of law may itself establish sufficient public injury to warrant relief. See *Du Pont*, 366 U. S., at 319–321; see also *Virginian R. Co.* v. *Railway Employees*, 300 U. S. 515, 552 (1937) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved"); *United States* v. *San Francisco*, 310 U. S. 16, 30–31 (1940)

(authorizing issuance of injunction at Government's request without balancing of the equities). A private litigant, however, must have standing—in the words of § 16, he must prove "threatened loss or damage" to his own interests in order to obtain relief. See *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U. S. 104 (1986). Moreover, equitable defenses such as laches, or perhaps "unclean hands," may protect consummated transactions from belated attacks by private parties when it would not be too late for the Government to vindicate the public interest.

Such questions, however, are not presented in this case. We are merely confronted with the naked question whether the District Court had the power to divest American of any part of its ownership interests in the acquired Lucky Stores, either by forbidding the exercise of the owner's normal right to integrate the operations of the two previously separate companies, or by requiring it to sell certain assets located in California. We hold that such a remedy is a form of "injunctive relief" within the meaning of § 16 of the Clayton Act. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, concurring.

In agreement with our holding that § 16 of the Clayton Act does authorize divestiture as a remedy for violations of § 7 of the Clayton Act, I join the Court's opinion. I write further to note that both the respondents and various interested labor unions, the latter as *amici curiae*, have argued for a different result on the basis of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (Clayton Act § 7A, as added and amended), 15 U. S. C. § 18a. See Brief for Respondents 47–48; Brief for United Food and Commercial International Union et al. as *Amici Curiae* 7–15. Although I do not believe that § 7A is controlling as an interpretation of the ear-

lier enacted § 16, it may be of vital relevance in determining whether to order divestiture in a particular case.

Section 7A enables the Federal Government to review certain transactions that might violate § 7 before they occur. The provision, in brief, requires those contemplating an acquisition within its coverage to provide the Federal Trade Commission (FTC) with the information necessary for determining "whether such acquisition may, if consummated, violate the antitrust laws." 15 U. S. C. § 18a(d)(1). During the mandatory waiting period that follows the submission of this information, see § 18a(b)(1), the agency may decide, as it did in this case, to negotiate a settlement intended to eliminate potential violations. See 16 CFR §§ 2.31–2.34 (1989). The procedure may resolve antitrust disputes in a manner making it easier for businesses and unions to predict the consequences of mergers and to conform their economic strategies in accordance with the probable outcome.

The respondents, and the unions in their brief as *amici,* argue that a State or private person should not have the power to sue for divestiture under § 16 following a settlement approved by the FTC. They maintain that the possibility of such actions will reduce the Federal Government's negotiating strength and destroy the predictability that Congress sought to provide when it enacted § 7A. It is plausible, in my view, that allowing suits under § 16 may have these effects in certain instances. But the respondents and unions have identified nothing in § 7A that contradicts the Court's interpretation of § 7 and § 16. Section 7A, indeed, may itself contain language contrary to their position. See, *e. g.,* 15 U. S. C. § 18a(i)(1). Although Congress might desire at some point to enact a strict rule prohibiting divestiture after a negotiated settlement with the FTC, it has not done so yet.

The Court's opinion, however, does not render compliance with the Hart-Scott-Rodino Antitrust Improvements Act irrelevant to divestiture actions under § 16. The Act, for instance, may bear upon the issue of laches. By establishing a

time period for review of merger proposals by the FTC, § 7A may lend a degree of objectivity to the laches determination. Here the State received the respondents' § 7A filings in mid-April 1988, see Brief for Petitioner 3, and so had formal notice of the parties' intentions well before completion of the merger or the settlement with the FTC. It elected not to act at that time, but now seeks a divestiture which, the facts suggest, would upset labor agreements and other matters influenced in important ways by the FTC proceeding. These considerations should bear upon the ultimate disposition of the case. As the Ninth Circuit stated:

> "California could have sued several months earlier and attempted to enjoin the merger before the stock sale was completed. The Attorney General chose not to do so. California must accept the consequences of his choice." 872 F. 2d 837, 846 (1989).

With the understanding that these consequences may include the bar of laches, I join the Court's decision.