Giovanni INDOMENICO, Plaintiff,

v.

**J.A. BREWSTER, Officer, Individually and in his Official Capacity, Defendant.**

No. 92 Civ. 2725 (VLB).

United States District Court, S.D. New York.

April 7, 1994.

---

Mitchell H. Spinac, Kingston, NY, for plaintiff.

David L. Posner, Poughkeepsie, NY, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This lawsuit presents the problem of proper treatment of a New Yorker whose license is suspended for disregarding a speeding ticket, and who returns to driving in the state with out-of-state license and out-of-state plates leading to conflict with the police. Plaintiff, claiming false arrest and improper use of force during an incident on August 18, 1990 (the "incident"), brought this suit under 42 U.S.C. § 1983; the defendant officer has moved for summary judgment dismissing the complaint. For the reasons set forth below, defendant's motion is granted with respect to plaintiff's damage claims, but not with respect to possible injunctive relief.

### II

In 1979, plaintiff received a ticket on the Taconic State Parkway for speeding. According to his deposition "... the ticket I just forgot about. I don't remember at all that ticket, you know. Pay, not pay, I don't remember. I paid the tickets."

According to law enforcement records, plaintiff did not respond to the 1979 ticket and his New York driver's license and privilege to drive in New York were suspended on February 7, 1980 under New York Vehicle & Traffic Law 510(4–a). Thereafter, plaintiff moved to Connecticut and secured a Connecticut license and registration, and a single Connecticut license plate.

Where a driver's license or privileges are suspended, the Department of Motor Vehicles automatically sends a notice to the driver at the address given on the license application, stating that "this order suspending your driver's license or privileges" will become effective thirty days from the date of the notice unless steps to avoid this are taken. No such steps occurred in this case. While it might have be preferable on a prospective basis under plain language concepts now in effect under State Administrative Procedure Act 201 as added by L.1992 ch. 331, for the notice to be made even more clear by using such terms as "privileges *to drive in New York*," the notice actually given should be sufficient to warn an ordinary person with sufficient knowledge of English to obtain a driver's license that driving in the State after receiving the notice is prohibited.[1]

### III

Plaintiff was driving in Poughkeepsie on Sunday morning, August 18, 1990, when he was observed by defendant both visually and by radar to be going approximately 45 miles per hour in a 30 mile zone.[2]

The defendant officer signalled plaintiff to pull over because of the speeding infraction.[3] At this stage, during the initial stop, no violence occurred; plaintiff turned over his Connecticut license to the defendant officer for inspection without being required to exit his vehicle.

A police radio check revealed that plaintiff's privilege to drive in New York had been suspended and the suspension was never lifted. At this point, the defendant officer initiated an arrest of plaintiff under New York Vehicle & Traffic Law 511(1). Because at the time of the arrest plaintiff was not permitted to drive in New York, the police determined that plaintiff must be taken to the

---

1. The question of the circumstances under which revocation of state licensing privileges may, consistent with the Commerce Clause of the Constitution, bar residents of other states with out-of-state licenses from driving in the state imposing the revocation has not been raised. Were a Commerce Clause limitation found applicable, it would not necessarily be retroactive. This question need not be reached because an overdue unpaid and unchallenged speeding ticket would be a basis for arresting plaintiff even were he not properly barred from driving at all in New York because of the revocation.

2. Plaintiff at his deposition said he was not speeding; when asked if he had told the judge he might have been speeding, plaintiff responded "maybe, because ... you can't fight the city hall ... To tell you the truth, I was behind an old lady, very old lady, and she wasn't even going 30 miles an hour ... it was in the morning, Sunday morning ..."

3. The defendant officer was also concerned about plaintiff's driving with only one license plate; Connecticut issues only one plate.

station in handcuffs and his car driven to an impoundment depot by police officers.

The defendant officer was in civilian clothes driving a car with police markings, wearing a badge which was observed by plaintiff. Although plaintiff had turned over his Connecticut driver's license and other papers without incident, plaintiff demanded additional evidence that defendant was a police officer and resisted when told to get out of his car to be taken to the police station. A scuffle ensued during which defendant and other officers who had arrived subdued plaintiff. Plaintiff insisted repeatedly at his deposition that three officers pointed machine guns at him and talked about machine guns.

Plaintiff asserts without medical corroboration that a prior elbow impairment was aggravated by the incident. He visited an emergency room on August 19, 1990, the day after the incident. A small abrasion on plaintiff's wrist was found; x-rays disclosed no indication of fractures. No stitches or other medical treatments were deemed necessary at the time and no steps other than follow-up examination was recommended.

Subsequent to the incident, plaintiff pleaded guilty to the 1979 speeding charge and paid the fine, but failed to appear in court on September 26, 1990 in connection with the August 18, 1990 speeding ticket issued by the defendant officer, resulting in a second suspension of New York driving privileges.

## IV

■ Plaintiff's claim of false arrest is meritless. While plaintiff disputes that he was speeding, the officer's radar confirmation of visual observation of such speeding was sufficient to permit the defendant officer to stop plaintiff's vehicle during the incident.

As explained in *United States v. Bold*, 19 F.3d 99 (2d Cir.1994), under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968):

A police officer may, in appropriate circumstances and in an appropriate manner, stop a person for purposes of investigating possibly criminal behavior, even though

there is no probable cause to make an arrest.

19 F.3d at 102.

■ Even where a "traffic violation ... was minor ... officers acted within their authority in stopping" a driver and indeed to make an arrest. *United States v. Scopo*, 99 F.3d 777, 781 (2d Cir.1994). It is reasonable for police to exercise greater leeway than otherwise, in stopping persons reasonably suspected of improper driving at the time of the stop, as in other circumstances where harm can be caused quickly and delay might vitiate the effectiveness of law enforcement. See *Michigan Dept. of Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (random stop on highway to check for drunken driving); *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (airport search).

Were the stop here to be held violative of the Constitution, virtually no arrest for speeding would be permissible, with the result that carnage on the highways might well escalate with few limits. The Constitution "is not a suicide pact," *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 160, 83 S.Ct. 554, 563, 9 L.Ed.2d 644 (1963). See also *New York v. Quarles*, 467 U.S. 649, 657–58, 104 S.Ct. 2626, 2632–33, 81 L.Ed.2d 550 (1984) in which the Court stated, in holding *Miranda* warnings not required prior to questioning during an emergency situation at a crime scene, that it was inappropriate to

... place officers ... in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions ...

■ Once it had been determined after the stop that plaintiff's privilege to drive in New York had been suspended, plaintiff's arrest under Vehicle & Traffic Law 511(1) was likewise supportable.

## V

■ Plaintiff resisted arrest, thus justifying reasonable force based upon the requirements of the circumstances. See *Finnegan v. Fountain*, 915 F.2d 817, 823 (2d Cir.1990).

There is a total absence of any stitches or other treatment required when plaintiff visited the emergency room the day following the incident, or any other indication that any drastic violent event occurred in connection with plaintiff's arrest.

■ Plaintiff's version of the incident in which he asserts that three officers pointed machine guns at him is "implausible ... one that simply makes no ... sense," thus requiring him in order to avoid summary judgment against him under Fed.R.Civ.P. 56 to "come forward with more persuasive evidence to support [the] claim than would otherwise be necessary." *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Despite full availability of discovery, plaintiff has, perhaps understandably, made no effort to pursue or support the claim at his deposition that machine guns were in fact present, much less pointed at him.[4] Instead, plaintiff's counsel argues in the memorandum of law in opposition to defendant's motion for summary judgment that plaintiff's use of the term "machine guns" was due to poor knowledge of English.

No affidavit of the plaintiff or any other party, deposition testimony or other support has been provided either indicating that plaintiff's version was correct, or for the unsworn suggestion in the memorandum that plaintiff was unaware of the meaning of the term, which he repeatedly used during his deposition.

## VI

■ Even were the force used found to be excessive upon hindsight, there is nothing to suggest that the defendant officer knew or should have known that measures taken, short of deadly force or force causing significant immediately traceable or treatable injuries, were unreasonable where arrest was resisted. Accordingly, the defendant officer is entitled to qualified immunity from plaintiff's damage claims. See *Harlow v. Fitzger-*

*ald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ Qualified immunity is available to officers for actions taken within the scope of their responsibilities because of the risk of deterring vigorous legitimate performance of duty if such lawsuits are permitted without adequate support. See *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In enacting the Federal Employees Liability Reform and Tort Compensation Act, Public Law 100–694, 102 Stat. 4563 (1988), adopting 28 U.S.C. § 2679(b), Congress recognized that the "possible exposure of ... employees to personal liability could lead to a substantial diminution of the vigor of ... law enforcement and implementation." See H.Rep. No. 700, 100th Cong. 2d Sess. *reprinted in* 1988 U.S.Code Cong. & Admin.News 5945, 5947.

## VII

It would be tempting to close this case without more now that it has been determined that plaintiff's monetary claim cannot survive defendant's motion for summary judgment. To do so, however, would ignore the potential for unnecessarily and hence unreasonably triggering violent incidents which may be inherent in the policy which is suggested by the incident before me.

■ The requirements for consideration of injunctive relief under Fed.R.Civ.P. 65 differ significantly from those necessary to support a claim for damages. The difference is significant in two complementary respects. For purposes of equitable relief, only a threatened, not actual violation must be shown. On the other hand, a significant risk of future impropriety injurious to the plaintiff must be shown. See generally *California v. American Stores*, 495 U.S. 271, 282–85, 110 S.Ct. 1853, 1859–61, 109 L.Ed.2d 240 (1990).

■ Notwithstanding the fatal weaknesses in plaintiff's damage claim, summary judgment cannot be granted concerning the possibility of injunctive relief. Both effective action against license revocation scofflaws, and avoidance of over-reaction where an in-

---

4. Plaintiff makes no claim that any discovery sought on his behalf was denied, or that more discovery is needed to respond to defendant's motion for summary judgment.

fraction is minor, are important to the public interest—just as is both fair and effective law enforcement generally.

As an out-of-state driver living close to a former residence in New York and with a motor vehicle record in New York such as that of plaintiff, leading indeed to a new suspension growing out of the incident itself, plaintiff is reasonably likely to incur a new, similar confrontation; consequently he may have requisite standing to seek injunctive relief if otherwise justified. See *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

It would be premature at this juncture to determine whether or not, although federal law was not violated in connection with the August 18, 1990 incident, policies originating with municipal decisionmakers may cause a risk of violation of federal law sufficient to support injunctive relief.[5]

Policy decisions calling for treatment of all suspensions as a basis for arresting the driver and impounding the vehicle regardless of whether the driver has a valid license from another state, regardless of the reason for the suspension, and regardless of its vintage, may be unnecessary and likely to lead to incidents involving use of force that could be deemed excessive and unnecessary under the totality of the circumstances.[6]

### VIII

A ruling on the matters just mentioned may not be required if they can be resolved by re-evaluation of agency policy seeking to act effectively against license revocation scofflaws while taking all circumstances into account in determining how this should be done. Alternatively, especially since State motor vehicle authorities who determine how much information is available to local police radioing to check licenses, as well as municipal police, are necessarily involved in dealing with this problem, settlement including provision for neutral examination of the problem with the support of the agencies involved may also satisfy the concerns expressed here.

SO ORDERED.

---

**5.** See *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); see also *Allen v. City of Yonkers*, 803 F.Supp. 679, 683–84 (S.D.N.Y.1992).

**6.** The Report of the Task Force on Administrative Adjudication of the New York State Bar Association 38–71 (1988) found indications of pressure for fulfillment of quotas for findings of traffic infractions, suggesting the possibility that strict patrolling for marginal speeding during early weekend mornings when no little traffic is on the road may occur for such reasons in a manner likely to cause unnecessary confrontations.