**Robert H. MILLER, Regional Director of region 20 of the National Labor Relations Board, FOR AND ON BEHALF OF the NATIONAL LABOR RELATIONS BOARD, Petitioner–Appellant,**

v.

**CALIFORNIA PACIFIC MEDICAL CENTER, Respondent–Appellee.**

**Robert H. MILLER, Regional Director of region 20 of the National Labor Relations Board, FOR AND ON BEHALF OF the NATIONAL LABOR RELATIONS BOARD, Petitioner–Appellee,**

v.

**CALIFORNIA PACIFIC MEDICAL CENTER, Respondent–Appellant.**

**Nos. 92–15721, 92–15746.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 19, 1992.

Decided April 13, 1993.

Jerry M. Hunter, General Counsel, Yvonne T. Dixon, Acting Deputy General Counsel, Robert E. Allen, Associate General Counsel, Ellen A. Farrell, Asst. General Counsel, Corinna L. Metcalf, Deputy Asst. General Counsel, Elinor L. Merberg, N.L.R.B., Washington, DC, for Robert H. Miller, petitioner-appellant-cross-appellee.

Jerome B. Falk, Jr., Steven L. Mayer, Pauline E. Calande, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, CA, Gerald R. Lucey, Joseph E. Wiley, Tracy Lessen Gersten, Corbett & Kane, Emeryville, CA, for respondent-appellee-cross-appellant California Pacific Medical Center.

Before KOZINSKI and THOMPSON, Circuit Judges, and von der HEYDT, District Judge.*

KOZINSKI, Circuit Judge:

We decide when a preliminary injunction constitutes "just and proper" interim relief in an unfair labor practice case.

### Background [1]

Children's Hospital of San Francisco and Pacific Presbyterian Medical Center used to be independent hospitals in San Francisco. In July 1990 they decided to merge based on an estimate that integration of their facilities would save as much as $60 million over the first five years of operation by reducing duplication of services, equipment and staff. *See* CR 20 at 3–4. The Federal Trade Commission approved the merger, which became final on June 16, 1991. A new entity, California Pacific Medical Center, assumed operation of the facilities.

After the merger, CPMC contacted the six unions that had represented employees at either Children's or Presbyterian. CPMC advised those unions that had collective bargaining agreements, and that also represented a majority of the employees in the combined units, that "it is our intention to recognize your status as the collective representative of covered employees and to honor our obligation under that contract." *E.g.*, CR 15 at 2. This turned out to include all unions that had represented employees either at Children's or Presbyterian, save one. *See* CR 20 at 1–2.

The exception was the California Nurses Association. Before the merger, the union represented the 568 registered nurses at Children's; the 802 registered nurses at Presbyterian, however, were not represented by CNA or any other union. The most recent collective bargaining agreement between the union and Children's ran from August 1, 1988, to May 31, 1991; no new agreement had been reached. In March 1991, Children's informed the union that it was terminating the collective bargaining agreement as of its expiration date of June 1, 1991, in accordance with the agreement's terms. After the merger, CPMC sent a letter notifying the union that it wouldn't recognize it as the bargaining agent for the nurses, because the union (with its membership of 568 nurses) no longer represented a majority of the approximately 1300 nurses at the combined facility. CPMC then petitioned the National Labor Relations Board for an election by the CPMC nurses of their bargaining representative, and invited the union to join with it in

* The Honorable James A. von der Heydt, Senior United States District Judge for the District of Alaska, sitting by designation.

1. The district court's opinion, *Miller ex rel. NLRB v. California Pac. Medical Ctr.*, 788 F.Supp. 1112, 1113–15 (N.D.Cal.1992), sets out all of the relevant facts. We merely summarize them here.

conducting the election. *See* NLRB Case # 20–CA–24067; CR 1 at 2; *id.* at exh. C; CR 15 at 6–7.

Instead, the union filed an unfair labor practice charge with the Board, thereby precluding the election. *See* CR 15 at 8–9. For several months, the Board dawdled. During that time, CPMC raised the wages of the nurses working at the former Children's hospital in order to bring them into line with the higher wages at Presbyterian, and made several other changes to the terms and conditions of their employment, some more favorable than under the expired collective bargaining agreement, some not.

Eight months after the filing of the unfair labor practice charge, the Board's Regional Director, Robert H. Miller, petitioned the district court for a preliminary injunction pursuant to section 10(j) of the National Labor Relations Act. Section 10(j) authorizes the Board to seek interim relief pending its resolution of unfair labor practice complaints; the district court has "jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j). The court granted the injunction and required CPMC to recognize and bargain with the union. Moreover, the court ordered CPMC to restore all pre-merger terms and conditions of employment for the nurses who used to be represented by the union, pending the Board's resolution of the complaint. *See* 788 F.Supp. at 1117. CPMC appeals, arguing the district court applied the wrong standard in issuing the injunction. Dissatisfied with the scope of the injunction, the Board also appeals, arguing the court erred in not allowing the union to pick and choose which pre-merger contract terms it wished to retain. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## Discussion

### I

■ **A.** We apply a two-part test to determine whether section 10(j) injunctive relief is appropriate:

1. whether there is "reasonable cause" to believe that the unfair labor practices for which interim relief is sought have occurred[; and]

2. whether the relief sought is "just and proper" to preserve the Board's ability effectively to remedy the violations alleged.

*Scott ex. rel. NLRB v. El Farra Enters.,* 863 F.2d 670, 673 (9th Cir.1988).

As to the first inquiry, the district court found reasonable cause to believe that an unfair labor practice had occurred. *See* 788 F.Supp. at 1115–16. CPMC doesn't challenge this finding. *See* CPMC's Opening Brief at 13 n. 10; CPMC's Reply Brief at 5. Rather, it challenges the standard the district court used in conducting the second inquiry, whether the requested relief was "just and proper." The district court rejected CPMC's argument that an injunction should issue only after a finding of irreparable harm and likely success on the merits, the traditional equitable bases for injunctive relief. *See* 788 F.Supp. at 1115 n. 1. Instead, it held that "the 'just and proper' element [of section 10(j)] is met by a showing that the relief is necessary to prevent a frustration of the remedial purposes of the Act." *Id.* at 1116 (quotation marks and citation omitted).

■ Although district courts have wide discretion in issuing preliminary injunctions, "[w]here the district court is alleged to have relied on erroneous legal premises, review is plenary." *America West Airlines v. National Mediation Bd.,* 969 F.2d 777, 783 (9th Cir.1992); *see also Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1517 (9th Cir.1992) (preliminary injunction may be reversed if based on erroneous legal standard). Because this is precisely the scope of CPMC's challenge, we review de novo.

**B.** It's a "fundamental principle that an injunction is an equitable remedy that does not issue as of course." *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987).

The standards we have adopted for the issuance of preliminary injunctions are rooted deeply in our legal tradition, and stem from the historical division of authority between courts of law and equity. *See generally* Dan B. Dobbs, Handbook on the Law of Remedies § 2.10 at 108–11 (1973); Charles Rembar, The Law of the Land 272–77, 303–05 (1980); *see also* Pomeroy's Equity Jurisprudence § 1337 (5th ed. (Symons) 1941) (tracing injunctions to the interdicts of Roman law).

In reviewing the grant of a preliminary injunction, we consider the following traditional equitable factors:

> (1) the likelihood of plaintiff's success on the merits; (2) the possibility of plaintiff's suffering irreparable injury if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by the provision of preliminary relief.

*United States v. Odessa Union Warehouse Co–Op*, 833 F.2d 172, 174 (9th Cir. 1987) (citations omitted). Stated another way, "the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in its favor." *United States v. Nutri–Cology, Inc.*, 982 F.2d 394, 397 (9th Cir.1992) (quotation marks and citations omitted). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Odessa Union Warehouse Co–Op*, 833 F.2d at 174.

Nonetheless, the Board urges and the district court held, the standard for issuing preliminary injunctions under section 10(j) is different. Specifically, the Board maintains *Scott ex rel. NLRB v. El Farra Enters., Inc.*, 863 F.2d 670 (9th Cir.1988), and *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744 (9th Cir.1988), hold that section 10(j) injunctions need only be consistent with the aims of the National Labor Relations Act to constitute "just and proper" relief within the meaning of the statute.

We did say in *Tomco* that "[a]lthough the district court has broad discretion in its determination of whether to grant 10(j) relief, its ruling is nonetheless subject to meaningful review to ensure *consistency with the statutory purposes*." 853 F.2d at 748 (emphasis added).[2] Moreover, we have long said that district courts should consider broader public interests—as evidenced by the policies underlying the federal labor statutes—when fashioning appropriate relief. *See, e.g., Brown v. Pacific Tel. & Tel.*, 218 F.2d 542, 544–45 (9th Cir.1954) (Pope, J., concurring). "[M]aintaining the integrity of the collective bargaining process" is indisputably part of the public interest in a section 10(j) suit, and is therefore a consideration the court must take into account. *Tomco*, 853 F.2d at 749.

But none of this contradicts the fundamental principle that injunctions are equitable in nature and should only issue when supported by the equities. Our cases do, of course, say that section 10(j) injunctions must be consistent with statutory purposes; because the statute provides authority for the injunction, it follows ineluctably that the injunction must be consistent with the statute. But we've never held this is the only criterion for the issuance of an injunction. Far from superseding traditional equitable factors, "the public interest is a factor which courts must consider in *any* injunctive action in which the public interest is affected." *American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 967 (9th Cir.1983) (emphasis added); *see also Wein-*

---

**2.** It's significant that both *Tomco* and *El Farra* support the "consistency with statutory purposes" statement with a citation to *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416–17, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975), a Title VII case. *See Tomco*, 853 F.2d at 748; *El Farra*, 863 F.2d at 676. While Title VII relief must indeed be consistent with statutory purposes, it's manifestly equitable in nature. *See* 422 U.S. at 416, 95 S.Ct. at 2371; *Curtis v. Loether*, 415 U.S. 189, 197, 94 S.Ct. 1005, 1010, 39 L.Ed.2d 260 (1974).

*berger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

Nothing in either *El Farra* or *Tomco* can be construed as rejecting the role of equitable balancing. Rather, each case involved relatively limited relief in the face of particularly egregious employer misconduct. *El Farra* dealt with individual employees who alleged their employer had used a merger as a pretext for dismissing them in retaliation for union-related activities, 863 F.2d at 671–72, 676; the employees in *Tomco* had been fired, again for union organizing, 853 F.2d at 745. These situations present the most compelling cases for relief: "Interim reinstatement is just and proper where an employer has terminated an employee for union activities because such a termination has a 'serious adverse impact on employee interest in unionization.'" *Id.* at 749 (quotation marks, citation and footnote omitted).

■ Moreover, *Tomco* explicitly considered the equitable factors of delay and the balance of hardships. 853 F.2d at 750. Although the court concluded these considerations weren't sufficient to preclude the injunction in that case—understandable, in light of the flagrancy of the employer's unfair labor practice—the court unmistakably acknowledged the role of equitable considerations. Had *El Farra, Tomco* or any other case meant to take the extraordinary step of uprooting injunctions from the equitable soil from which they sprang, it would have said so explicitly. The most we can deduce from their silence on this point is that they found it unnecessary to consider the degree to which equitable balancing must be included in section 10(j) cases. It is a venerable principle that a court isn't bound by a prior decision that failed to consider an argument or issue the later court finds persuasive. *See, e.g., United*

*States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37–38, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); *see also United States v. Vroman,* 975 F.2d 669, 672 (9th Cir.1992); *United States v. Faulkner,* 952 F.2d 1066, 1071 n. 3 (9th Cir.1991).

■ Nor are we persuaded today to cast aside the long history of equity in issuing injunctions. We don't construe statutes in derogation of the common law, absent a clear legislative statement to the contrary. *See, e.g., In re Mark Anthony Constr.,* 886 F.2d 1101, 1107 (9th Cir.1989); *Ducey v. United States,* 713 F.2d 504, 510 (9th Cir.1983). This rule of construction carries particular force when it comes to issuing injunctions: "These commonplace considerations applicable to cases in which injunctions are sought in the federal courts reflect a practice with a background of several hundred years of history, a practice of which Congress is assuredly well aware." *Romero–Barcelo,* 456 U.S. at 313, 102 S.Ct. at 1803 (citation omitted); *see also Hecht v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944). There's a limited exception to this rule, when Congress explicitly cabins a court's equity jurisdiction:

> Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles.... Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.

*Romero–Barcelo,* 456 U.S. at 313, 102 S.Ct. at 1803–04 (citation omitted); *see also Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987). Nothing in section 10(j) "in so many words, or by a necessary and inescapable inference" turns away from the established equity practice for issuing preliminary injunctions. The Board points to no textual or structural aspects of the Act supporting the view that section 10(j) abrogated these venerable principles,

nor does our reading of the statute disclose any such evidence.[3]

Moreover, section 10(j) must be viewed against the backdrop of the Norris–LaGuardia Act's prohibition against labor injunctions. *See* 29 U.S.C. §§ 101–110. While section 10(j) is an exception to this general rule, it's a narrow one:

> [T]he issuance of an injunction is an extraordinary remedy indeed. This is especially true in the labor field where Congress by the Norris–LaGuardia Act deprived the federal courts of jurisdiction to issue injunctions in labor disputes. One exception to this almost blanket prohibition was carved out by Congress in section 10(j).... This section in no way changed the extraordinary nature of the injunctive remedy.

*McLeod ex rel. NLRB v. General Elec. Co.*, 366 F.2d 847, 849 (2nd Cir.1966), *vacated on other grounds*, 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967). Given this context, we won't construe section 10(j) as dispensing with the historical restraints of equity jurisprudence.

■ Our interpretation of the phrase "just and proper" in section 10(j) is consistent with our interpretations of similar statutory provisions in other contexts. We have repeatedly held that preliminary injunctions to protect statutory interests should only issue in accordance with traditional equitable standards. *See, e.g., Arcamuzi v. Continental Air Lines*, 819 F.2d 935, 937 (9th Cir.1987) (Railway Labor Act); *Regents of the Univ. of Cal. v. ABC, Inc.*, 747 F.2d 511, 515 (9th Cir.1984) (Sherman Act § 1); *Federal Trade Comm'n v. Evans Prods. Co.*, 775 F.2d 1084, 1086 (9th Cir. 1985) (Federal Trade Comm'n Act). And identical language in section 10(*l*), a companion to section 10(j), has been interpreted as requiring the court to consider the equities before issuing the "just and proper" relief specified in that statute. *See, e.g., Danielson v. Joint Bd. of Coat, Suit &*

*Allied Garment Workers' Union*, 494 F.2d 1230, 1241–42 (2nd Cir.1974) (Friendly, J.).

In construing section 10(j) as embodying equitable principles we join the consensus of other circuits who have considered the issue. The Seventh Circuit, for example, has ruled that "[s]ection 10(j) doesn't tell us what it means to say that relief is 'just and proper,' but we have no doubt that this phrase calls upon the district court to evaluate the ... request with an eye toward the traditional equitable principles that normally guide such an inquiry." *Kinney v. Pioneer Press*, 881 F.2d 485, 490 (7th Cir. 1989) (Easterbrook, J.). Likewise, the First Circuit has held that to determine "whether injunctive relief is just and proper in a section 10(j) proceeding, the whole panoply of discretionary issues with respect to granting preliminary relief must be addressed." *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir.1986) (quotation marks omitted). *See also Arlook ex rel. NLRB v. S. Lichtenberg & Co.*, 952 F.2d 367, 373–74 (11th Cir.1992); *Silverman ex rel. NLRB v. 40–41 Realty Associates, Inc.*, 668 F.2d 678, 680 (2nd Cir.1982); *Boire ex rel. NLRB v. Pilot Freight Carriers*, 515 F.2d 1185, 1192–93 (5th Cir.1975), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976). *But see Fleischut v. Nixon Detroit Diesel*, 859 F.2d 26, 30 n. 3 (6th Cir.1988) ("Congress has authorized relief under section 10(j) upon a showing that such relief is 'just and proper' and not upon a more stringent requirement such as irreparable harm."); *Kobell v. Suburban Lines*, 731 F.2d 1076, 1078 (3rd Cir.1984); *Minnesota Mining & Mfg. Co. v. Meter ex rel. NLRB*, 385 F.2d 265, 272 (8th Cir.1967) (dictum).

**C.** While we must vacate the injunction based on the foregoing analysis, we consider CPMC's subsidiary arguments because the district court may well be asked to reissue the injunction on remand.

---

**3.** Although legislative history is a notoriously unreliable indicator of legislative intent, the Second Circuit has plumbed the NLRA's history and concluded that it, too, is bereft of any indication that Congress intended to displace traditional equitable principles in passing section 10(j). *See Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union*, 494 F.2d 1230, 1241–42 (2nd Cir.1974) (Friendly, J.).

### 1. Likelihood of Success

For a preliminary injunction, "the irreducible minimum ... is that the moving party demonstrate a fair chance of success on the merits." *Sports Form, Inc. v. United Press Int'l*, 686 F.2d 750, 753 (9th Cir.1982) (citations omitted). In a section 10(j) case, this means the district court must assess the probability that a complaining party will ultimately prevail in its unfair labor practice charge before the Board. CPMC advanced several persuasive arguments in the district court why the union is unlikely to succeed on the merits of its claim. *See* CR 25 at 20–22. For example, CPMC contended that the appropriate bargaining representative must be determined in light of the public policy against the proliferation of bargaining units in the health care industry. *See, e.g., NLRB v. HMO Int'l/Cal. Medical Group Health Plan*, 678 F.2d 806, 812 (9th Cir.1982). CPMC also argued that, because of the unique status of the health care industry, the traditional "community of interest" standard is no longer appropriate for identifying proper bargaining units in a hospital; rather, the test is one of "disparity of interests." *See, e.g., NLRB v. St. Francis Hosp.*, 601 F.2d 404, 418–19 (9th Cir.1979). Furthermore, while the district court found that many employees continue to work in their former positions at separate facilities, 788 F.Supp. at 1116, the single-facility presumption most likely doesn't apply to the health care industry, *see Long Island Jewish–Hillside Med. Ctr. v. NLRB*, 685 F.2d 29, 34 (2nd Cir.1982); *Presbyterian/St. Luke's Med. Ctr. v. NLRB*, 653 F.2d 450, 454–57 (10th Cir.1981). And even if the single-facility presumption applies, CPMC may have been able to rebut it. *See NLRB v. Catherine McAuley Health Ctr.*, 885 F.2d 341, 347 (6th Cir.1989) (geographic proximity, along with centralized operations, may justify unitary bargaining representation).

■ Although the district court's discussion of reasonable cause touched on the likelihood of success, its failure to weigh these factors in relation to the likelihood of success is perhaps understandable due to the *de minimis* nature of the reasonable cause inquiry. As our cases establish, however, the reasonable cause inquiry performs work quite distinct from the just and proper inquiry. Although the two determinations obviously overlap, the "Board's burden to establish reasonable cause to believe that an employer has violated the Act is *minimal.*" *Tomco*, 853 F.2d at 748 (emphasis added). Reasonable cause goes only to the maturity of the proof supporting the Board's decision to seek an injunction. In conducting this inquiry, the district court must assess whether there has been a sufficient investigation into the circumstances requiring injunctive relief, and whether the petition is supported by sufficient factual allegations. *See id.* (reasonable cause existed because the Board submitted "numerous affidavits in support of petition for injunctive relief"); *El Farra*, 863 F.2d at 673–74 (reasonable cause is satisfied if there's a showing of factual issues which must be resolved by the Board). Although few petitions fail to clear the reasonable cause hurdle, there will nonetheless be cases where the district court can avoid the complex task of balancing the equities if it decides the Board's request lacks a factual foundation. Moreover, given that the degree of required irreparable harm decreases as the likelihood of success increases, *United States v. Odessa Union Warehouse Co–Op*, 833 F.2d 172, 174 (9th Cir.1987), it behooves the Board to make the strongest possible showing that it's likely to succeed on the merits.

### 2. Irreparable Harm

■ Nor did the district court consider the crucial question of the union's ability to demonstrate irreparable harm from awaiting the Board's resolution of this claim. Such delay is a recurrent problem in section 10(j) suits, as Board proceedings are notorious for their "glacial speed in adjudicating unfair labor practices." *United States v. International Bhd. of Teamsters*, 948 F.2d 98, 111 (2nd Cir.1992) (Winter, J., dissenting), *vacated as moot*, — U.S. —, 113 S.Ct. 31, 121 L.Ed.2d 4 (1992); *see also Kobell*, 731 F.2d at 1102 (Aldisert, J., concurring) (decrying NLRB's "decelerat[ion] from its usual snail's pace"); *The*

*Snails of Justice,* Wall St.J., Feb. 16, 1993, at A1 (reporting resolution of 11½–year–old complaint before NLRB). Although "[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper," *Tomco,* 853 F.2d at 750 (4 months), that the Board tarried so long before seeking this injunction is nonetheless relevant in determining whether relief is truly necessary. "Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co.,* 762 F.2d 1374, 1377 (9th Cir.1985); *accord Kobell v. Suburban Lines, Inc.,* 731 F.2d 1076, 1092 n. 27 (3rd Cir.1984) ("[T]he district court may legitimately think it suspicious that the party who asks to preserve the status quo through interim relief has allowed the status quo to change through unexplained delay.").

At the same time, the delay here suggests that "the harm has occurred and the parties cannot be returned to the status quo." · *Tomco,* 853 F.2d at 750. As the district court found, the union's membership had already been significantly depleted by the time the Board petitioned for an injunction. *See* 788 F.Supp. at 1116 (312 of 548 registered nurses who were members of the union had left CNA by December 1991). Moreover, the district court found that "the changes instituted by [CPMC] were insufficient to affect the ... nurses [sic] employee attitudes towards union representation." *Id.* It's therefore unlikely that any further harm will result while the parties await final action by the Board. Because the detrimental effects, if any, of the alleged unfair labor practice have already taken their toll, "the Board's final order is likely to be as effective as an order for interim relief." *Tomco,* 853 F.2d at 750; *see also Pilot Freight Carriers, Inc.,* 515 F.2d at 1193. On remand the district court must reconsider whether granting the temporary injunction at this late date would advance any substantial statutory purpose.

### 3. *Balance of Hardships*

The district court also erred by failing to weigh "the relative hardships ... that will result from granting or withholding a particular equitable remedy." Robert S. Thompson & John A. Sebert, Jr., Remedies § 3.05 at 3–50 (1983). "Since all or almost all equitable remedies are discretionary, the balancing of equities and hardships is appropriate in almost any case as a guide to the chancellor's discretion." Dobbs, *supra,* § 2.4 at 52; *see also* Pomeroy's Equity Jurisprudence, *supra,* § 109 (discussing flexibility and adaptability of equitable remedies).

The *raison d'etre* of this merger was the total integration of the two hospital facilities, and the uniform treatment of personnel was central to the integration. Reversing the changes at this late stage, even if done only for the nursing units, would be a pro tanto unscrambling of the merger. As CPMC's Vice President stated,

> [i]f an injunction is granted, all of the current personnel policies and procedures which were adopted by CPMC would have to be rescinded and policies uniform for all employees of CPMC except the registered nurses ... would have to be adopted. CPMC could not simply add the current policies and procedures because they were written assuming that the two nursing staffs would be integrated.

CR 20 at 4. Thus, for example, the unitary compensation scheme would have to be abandoned in favor of the old, disparate pay scales. This would result in a wage reduction at one of the facilities (because CPMC adopted the higher of the two scales when the hospitals merged), with the attendant drop in employee morale. *See* CR 2 at 86–87; CR 20 at 4–5. As a result of the merger, similar changes have been made to employee benefits, such as health insurance, overtime and retirement plans; to the sickness, holiday and vacation leave schemes; to the disciplinary and grievance mechanisms; and to myriad other personnel policies and procedures. *See* CR 20 at 4–6; *see also* 788 F.Supp. at 1114–15 (opinion below) (discussing integration of facilities). The administrative hardship of maintaining separate wage and benefit proce-

dures for union and nonunion employees would be particularly inequitable given the purpose of this merger—turning two hospitals into one.

■ Courts do not lightly issue injunctive relief that requires dissolution of completed mergers, because of the difficulty of separating merged corporations, or parts of them, back into distinct entities. *See, e.g., Baltimore & Ohio R.R. Co. v. United States,* 386 U.S. 372, 391–92, 87 S.Ct. 1100, 1110, 18 L.Ed.2d 159 (1967) (Interstate Commerce Act); *California v. American Stores Co.,* 495 U.S. 271, 292–93, 110 S.Ct. 1853, 1864–65, 109 L.Ed.2d 240 (1990) (Clayton Act § 16); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970) (§ 14(a) of the Securities Exchange Act of 1934). This is especially true here, where the Board's petition comes long after changes in company ownership and structure are complete. It's possible, of course, that when the Board gets around to resolving the merits of the union's complaint CPMC will be found guilty of an unfair labor practice. In that case, the Board may order (subject to review in this court) that CPMC treat the nurses at each facility separately, effectively undoing that portion of the merger. But that's a far cry from the present situation. The district court's temporary relief risks putting CPMC to the burden of unscrambling the merger of the hospitals' nursing units when it ultimately may be absolved of any wrongdoing. While dissolving part of the merger might be appropriate relief upon a finding of an unfair labor practice, it's far harder to justify such a dramatic step prior to any Board finding of illegality on the part of CPMC. *See Kobell v. Suburban Lines, Inc.,* 731 F.2d 1076, 1103 (3rd Cir.1984) (Aldisert, J., concurring); *cf. McLeod ex rel. NLRB v. General Elec. Co.,* 366 F.2d 847, 850 (2nd Cir.1966) (purpose of section 10(j) is to *preserve,* not restore, status quo pending Board resolution of complaint), *vacated on other grounds,* 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967).

**4.** *Public Interest*

■ The district court made two critical errors in its assessment of the public inter-

est at stake in this case. As we have said, the court erred in holding that the public interest was the sole touchstone for section 10(j) relief, rather than but one of a mix of factors to be evaluated. But the court also erred in narrowly defining the public interest as including only "the integrity of the collective bargaining process." 788 F.Supp. at 1116. While the potential harm to the union from awaiting Board resolution of the complaint was certainly one justifiable concern, the court should also have been sensitive to the other public interests implicated by the injunction. Unpacking the merger might, for example, detract from the quality of medical care CPMC provides its patients. Currently, 80 nurses float between the two hospitals; similarly, both hospitals share a list of 450 per diem nurses that are available daily as temporary relief. Under the district court's injunction, these innovative procedures would have to be abandoned, because allowing individual nurses to work in both hospitals would result in different terms and conditions of employment for them. CR 20 at 4–5.

The district court also erred in failing to assess the impact of its injunction on the community in which the hospitals operate. *See, e.g.,* Alex Barnum, *Talks Held on Merger of Two Hospital Systems,* S.F. Chron., Sept. 17, 1992 at C1 (discussing trend toward integration of Bay Area hospitals to reduce costs and increase services). Employee layoffs from the increased cost and burden of administering two separate nursing staffs, reductions or irregularities in medical care for patients, decreased innovation in the health care industry—each of these weighty concerns are part of the public interest that the court should have taken into account before issuing its injunction.

**II**

Turning to the issues raised by the Board's appeal, the district court considered the request for a pick-and-choose remedy not once, but twice, after the Board

moved for "clarification" of the earlier decision. *See* 788 F.Supp. at 1117; CR 51 (clarification order). Each time, the court refused the Board's request. If the Board persuades the district court on remand that the requested relief satisfies traditional equitable standards, the issue of the injunction's scope will likely arise again; we therefore deem it prudent to address the issue.

 As the preceding part of the opinion makes clear, injunctions are equitable in nature. The remedy the Board sought—essentially asking to have its cake and eat it, too—would be inequitable in the extreme. It would also turn section 10(j), which is supposed to *preserve* the status quo, on its head: As the district court recognized, "to grant [the Board's] request would put CNA in a better position than they were prior to" the merger. 788 F.Supp. at 1118. The district court therefore didn't abuse its discretion in refusing the Board's request; indeed, it might well have done so had it ruled otherwise.

### Conclusion

The district court's injunction is **VACATED.** The case is **REMANDED** for proceedings consistent with this opinion.