**LOCKHEED MISSILE & SPACE COMPANY, INC., Plaintiff,**

**v.**

**HUGHES AIRCRAFT COMPANY; GM Hughes Electronics, Defendants.**

Civ. No. 95–20368 SW.

United States District Court, N.D. California.

June 7, 1995.

Jeffrey R. Chanin, Keker & Van Nest, San Francisco, CA, for plaintiff.

Vidden Lee Heard, Jr., Kirkland & Ellis, Los Angeles, CA, for defendants.

## ORDER DENYING PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER

SPENCER WILLIAMS, District Judge.

Plaintiff Lockheed Missiles & Space Company, Inc. ("Lockheed") brought this action against Hughes Aircraft Company and GM Hughes Electronics (collectively, "Hughes"), alleging that Hughes refused to honor a promise to supply Lockheed with a component that Lockheed needs to bid on a missile warning system contract for the United States government. Lockheed has applied for a temporary restraining order. For the reasons expressed below, Lockheed's application is DENIED.

## BACKGROUND

In 1984, as part of the Strategic Defense Initiative, better known as "Star Wars," the United States government established the Boost Surveillance and Tracking System ("BSTS") program to develop a replacement for the existing system used to detect missile attacks. The following year, Lockheed and Hughes entered into a "Memorandum Teaming Agreement" ("Teaming Agreement") and offered a joint proposal to the government for deploying a replacement system. The Teaming Agreement defined the roles and responsibilities of both companies. In particular, it designated Lockheed as the prime contractor and gave Lockheed responsibility for designing and assembling the system. Hughes was designated as a subcontractor and was responsible for developing a satellite-mounted infrared sensor to gather information about incoming missile attacks.

The government awarded development contracts to Lockheed for certain phases of BSTS work, and Lockheed in turn awarded development subcontracts for that work to Hughes in accordance with the Teaming Agreement. According to Lockheed, the two companies worked together on the sensor and Lockheed contributed significant technical expertise as well as substantial funding towards its development.

In 1990, the United States government terminated the BSTS program, eventually replacing it with the Follow-on Early Warning System ("FEWS"). Lockheed and Hughes agreed to work together on FEWS and entered into Amendment Number One to the Teaming Agreement ("Amended Teaming Agreement"). The Amended Teaming Agreement provided that (1) it applied to FEWS as well as successor programs of FEWS, and (2) Hughes would provide its sensor to Lockheed on an exclusive basis. The government awarded a FEWS contract to Lockheed, which subsequently awarded a subcontract to Hughes to continue the development of the sensor.

Three years after its initiation, the United States cancelled the FEWS program and launched the Space Based Infrared ("SBIRS") program. Lockheed alleges that the SBIRS program, which has an estimated $10 billion procurement contract, is a successor to the FEWS program as defined by the Amended Teaming Agreement.

In 1994, Lockheed merged with Martin Marietta Corporation. Subsequently, the Federal Trade Commission began evaluating the merger to determine whether it violated federal antitrust laws.

On November 29, 1994, the government announced that it was seeking bids on the SBIRS program. A few days later, the FTC asked Lockheed to enter into a consent order whereby Lockheed would relinquish its rights to the exclusive use of the Hughes sensor. Over the next few weeks, several of Hughes' corporate officers, including its Chairman and Chief Executive Officer allegedly gave Lockheed verbal and written assurances that the company was willing to supply Lockheed with its sensor. Lockheed further alleges that it signed the consent order on December 22, 1994 in reliance on these assurances.

Shortly after Lockheed signed the consent order, the parties began to quarrel over the sensor. Specifically, Lockheed alleges that on February 6, 1995, Hughes attempted to condition its supply of the sensor on Lockheed's agreement to procure the ground elements of the SBIRS program from Hughes. Lockheed claims that Hughes did so only after learning that Lockheed had established an exclusive teaming arrangement with Aerojet–General Corporation ("Aerojet") and Loral Corporation ("Loral") concerning the ground elements of the SBIRS program. When Lockheed formalized its agreement with Loral and Aerojet, Hughes allegedly withdrew its February 6, 1995 proposal and advised Lockheed that it would provide the sensor to Lockheed only if Lockheed permitted Aerojet to offer ground elements to Hughes. Lockheed refused, informing Hughes that Hughes agreed to supply the sensor unconditionally and that the condition Hughes demanded would require Lockheed to breach its contract with Aerojet and Loral.

Lockheed, Hughes and a third contractor submitted competing SBIRS proposals to the government on March 24, 1995. Relying on the commitments Hughes allegedly made in the Amended Teaming Agreement and in December 1994, Lockheed's proposal included the Hughes sensor as a component. Lockheed claims that it notified Hughes of the Lockheed proposal and that Hughes did not respond in any way.

On June 9, 1995, the government is expected to decide which of the three contractors are qualified to be selected for the next phase of the project. The final selection of two contractors will be announced in mid-July, 1995.

The Air Force began reviewing Lockheed's proposal and on May 27, 1995, asked Lockheed to submit, by June 7–8, 1995, a letter from Hughes confirming that Hughes would furnish Lockheed with its sensor. Lockheed requested Hughes to provide that confirmation, but on May 30, 1995, Hughes refused to so and advised Lockheed that it would not supply the sensor.

Lockheed alleges that Hughes' refusal to provide the sensor jeopardizes Lockheed's chances of being chosen to serve as the prime contractor on the SBIRS program. Lockheed further alleges that it cannot incorporate another sensor into its system because the Hughes technology is superior to others and for certain applications, has no substitute.

Lockheed's complaint asserts the following claims: (1) Declaratory Relief; (2) Breach of Written and Oral Contract—December Agreement; (3) Promissory Estoppel; (4) Breach of Written Agreement—Amended Teaming Agreement; (5) Breach of Covenant of Good Faith and Fair Dealing—Amended Teaming Agreement and December Agreement; (6) Breach of Covenant of Good Faith and Fair Dealing—Denial of the Existence of the December Agreement; (7) Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Cartwright Act, Cal.Bus. & Prof. Code § 16700 et seq.—Refusal to Deal/Intent; (8) Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Cartwright Act, Cal.Bus. & Prof.Code § 16700 et seq.—Refusal to Deal/Essential Facilities; (9) Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Cartwright Act, Cal.Bus. & Prof.Code § 1620 et seq.—Attempted Monopolization; and (10) Breach of Fiduciary Duty.

In its claim for declaratory relief, Lockheed seeks a judicial declaration that Hughes

is and remains contractually obligated to provide Lockheed with the sensor for the SBIRS program. Based on that claim, Lockheed requests a temporary restraining order enjoining Hughes' from representing to the United States Air Force that it has no obligation to provide Lockheed with its sensor for use as an element of Lockheed's space-based, missile-warning system for the SBIRS program and from proposing to furnish to the Air Force a Hughes missile-warning system that includes the Hughes sensor without making the sensor available to Lockheed.

## DISCUSSION

### I. LEGAL STANDARD

■ The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. In the Ninth Circuit, a district court may issue a preliminary injunction when the moving party demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and the balance of hardships tips sharply in its favor. *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987); *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1201 (9th Cir.1980). "These formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases." *Big Country Foods, Inc. v. Board of Educ. of the Anchorage School Dist.*, 868 F.2d 1085, 1088 (9th Cir.1989). However, although the *degree* of irreparable harm may be low if the probability of success on the merits is high, the moving party must in any case "demonstrate a significant threat of irreparable injury." *Arcamuzi*, 819 F.2d at 937. Moreover, under either formulation of the test, preliminary injunctive relief is not available unless the moving party can demonstrate some "fair chance of success on the merits, or questions serious enough to require litigation." *Id.*

■ Lockheed seeks mandatory injunctive relief requiring Hughes to make its sensor available to Lockheed. Where the moving party seeks a mandatory preliminary injunction granting relief that goes well beyond the status quo as it exists during the litigation, courts should be "extremely cautious." *Martin v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir.1984). Such relief is disfavored and should be granted only if the facts and law clearly favor the moving party. *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir.1976)).

## II. ANALYSIS

### A. Probability of Success on the Merits

Lockheed argues that it is likely to succeed on its claim for declaratory relief because Hughes' assurances to Lockheed in December 1994 that it would continue to supply Lockheed with its sensor are enforceable either as an express contract, or on the basis of promissory estoppel. In response, Hughes contends that there was never a meeting of the minds about the sensor and that because negotiations concerning the sensor were ongoing, there can be no reliance for purposes of promissory estoppel.

### 1. The Contract Theory

Lockheed relies on a number of communications by Hughes officials in support of its position that it had a contract with Hughes. For one, it notes that John Heintz, an assistant manager at Hughes, unambiguously stated at a December 13, 1994 meeting between Lockheed and Hughes officials that there was no scenario under which Hughes would not provide the sensor to Lockheed. Brashears Decl., ¶ 17. Lockheed also notes that neither of the other two Hughes officials who were at the meeting indicated any disagreement with Heintz's statement. *Id.*

In addition, Lockheed cites a "draft letter" it prepared on December 18, 1994. The draft letter contains terms upon which Lockheed believed the parties had agreed, including the following provisions:

> 3. ... Hughes agrees to offer to Lockheed on a Most Favored Customer basis the Basic Payload in the form of the modified Heritage Sensor including signal pro-

cessing and data rate controller electronics.

4. Hughes agrees to incorporate Lockheed-specific modifications to the Basic Payload, and to participate with Lockheed in the preparation of Lockheed's proposals on the SBIR Program.

Brashears Decl., ¶ 19, Exh. F.

Next, Lockheed cites Hughes' response to the draft letter—a letter dated December 19, 1994, from Hughes' Chairman, C. Michael Armstrong, to Lockheed's Chairman, Dan Tellep, in which Armstrong states that Hughes would "continue to offer the Basic Payload (and possibly other program elements) to Lockheed for the new SBIR effort." Tellep Decl., ¶ 9, Exh. E. Lockheed also points out that Tellep telephoned Armstrong on December 20, 1994 to follow up on the exchange of letters and that Armstrong never suggested that Hughes would not supply its sensor to Lockheed. *Id.*, ¶ 10.

■ After considering this series of communications, both individually and as a whole, the Court concludes that Lockheed does not have a fair chance of establishing that the parties had a contract obligating Hughes to furnish the sensor. First, the fact that Lockheed sent the draft letter to Hughes after the December 13, 1994 meeting suggests that Lockheed did not believe that the parties had reached a final agreement concerning the matter. Second, although Armstrong's December 19, 1994 letter to Tellep indicates Hughes' willingness to furnish a sensor to Lockheed, it does not accept the terms of the draft letter. Nor does it state that Hughes' offer is unconditional. Rather, the next sentence says, "We look to resuming discussions on this matter," Brashears Decl., Exh. G, clearly envisioning the need for further negotiations. Furthermore, nothing in the communications suggests that the parties had a meeting of the minds or that they otherwise agreed on any essential term of the agreement.

The record contains further evidence that the parties had not reached an agreement concerning the sensor. In a declaration filed in opposition to Lockheed's motion, John Heintz states that Lockheed refused to commit to using the Hughes sensor technology if Lockheed was awarded the SBIRS contract. Heintz Decl., ¶ 55. Heintz further states that approximately two days after the December 13 meeting, he telephoned Dr. Mel Brashears, Vice President and Assistant General Manager of Lockheed's Space Systems Division, a Lockheed vice president who was at the meeting, and told him that Hughes might refuse to offer its sensor if Lockheed refused to enter into a reciprocal agreement with Hughes regarding the sensor. *Id.*, ¶ 59.

Later letters Hughes officials sent to Lockheed should have disabused Lockheed of the notion that the parties had a contract. On February 6, 1995, George E. Speake, Jr., Senior Vice President of Hughes, wrote to Brashears and advised him that if Lockheed could not accept Hughes' offer, Hughes "intend[ed] to supply no hardware or software to [Lockheed] on SBIRS." Brashears Decl., Exh. I. The next day, Speake informed Brashears that "Hughes has no commitment to supply a sensor under conditions unilaterally developed by Lockheed." Speake Decl., Exh. 11. On February 8, Speake notified Brashears that Hughes was withdrawing its offer and that the company was "making other plans for SBIRS." Speake Decl., Exh. 13.

Speake wrote to Brashears again on February 15, making a new offer. Speake Decl., Exh. 15. Speake concluded the letter by saying "we continue to deny having subsequently made any binding commitment to supply Lockheed a sensor," and that if Lockheed rejected the offer, the companies would forego working together. *Id.* Lockheed rejected this offer. Speake Decl., Exh. M.

Lockheed also made its position clear in two letters written shortly before the SBIRS bids were submitted. On March 15, Armstrong wrote to Tellep, indicating that although discussions had resumed, the parties had not reached agreement. Speake Decl., Exh. 16. Armstrong also suggested that the companies "go forward separately." *Id.* In addition, on March 20, Speake warned Brashears that Lockheed's insistence on relying on Hughes' assurances was not justified. Speake Decl., Exh. 17.

Given this record, the Court cannot conclude that Lockheed is likely to succeed on the merits of its contract claim.

### 2. The Promissory Estoppel Theory

██ Lockheed also fails to establish that it is likely to succeed on its promissory estoppel theory. To succeed on its claim for promissory estoppel, Lockheed must prove that (1) Hughes made a clear and unambiguous promise; (2) Lockheed relied on the promise; (3) Lockheed's reliance was reasonable; and (4) damages resulted from the reliance. *See Laks v. Coast Federal Savings & Loan Ass'n,* 60 Cal.App.3d 885, 890, 131 Cal.Rptr. 836, 839 (1976). The record in this case indicates that Hughes made Lockheed aware of the need for further negotiations concerning the sensor. Under such circumstances, no promise is created. *See id.* at 891, 131 Cal.Rptr. at 839 (no promise created where offeree on notice that further negotiations are required to finalize terms); *see also B.M.L. Corp. v. Greater Providence Deposit Corp.,* 495 A.2d 675, 677 (R.I.1985) ("promissory estoppel cannot be based on preliminary negotiations and discussions"); *Keil v. Glacier Park, Inc.,* 188 Mont. 455, 614 P.2d 502, 506 (1980) (same).

### B. Irreparable Harm

██ Lockheed contends that it will suffer irreparable harm if the requested temporary restraining order does not issue in that it will lose the benefit of its investment in the sensor, its reputation as a competent defense contractor will be damaged and it will have to lay off employees. Lockheed further contends that the damages resulting from the loss of the SBIRS contract are uncertain. Hughes disagrees, arguing that the urgency and the irreparable nature of the alleged harm are contrived.

Lockheed's arguments are unavailing. The investment Lockheed made in the sensor is ascertainable and compensable by monetary damages. Indeed, the Brashears declaration indicates that Lockheed's sensor-related costs total more than $30 million. Brashears Decl., ¶ 49.

Furthermore, Lockheed offers no evidence to suggest that the damage to its reputation is irreparable or that it will have to reduce its workforce. Injunctive relief cannot rest on bald assertions such as these.

Finally, there is nothing in the record to suggest that Lockheed's potential damages are uncertain. The only support Lockheed cites for this argument is the Brashears declaration at paragraph 50. However, nowhere in paragraph 50 or anywhere else in his declaration does Brashears address the issue.

Therefore, the Court concludes that Lockheed has not established that it will suffer irreparable injury in the absence of a temporary restraining order.

### C. Balance of Hardships

██ According to Lockheed, denial of the temporary restraining order could take the company out of the running for the contract, whereas granting injunctive relief will not affect Hughes' ability to submit its own SBIRS proposal. In response, Hughes argues that complying with the temporary restraining order will require it to disclose trade secrets and divert resources away from its own design. Hughes further argues that because the sensor for the SBIRS project has not been designed, the decree Lockheed seeks will require the Court to engage in the oversight of a complex multidisciplinary engineering project.

The balance of hardships does not tip sharply in Lockheed's favor. Although Lockheed risks losing the contract, Hughes' competitive position will be adversely affected by the decree Lockheed seeks. Furthermore, the relief Lockheed seeks would open a Pandora's Box of uncertainties: the price, timetable and how the proprietary rights will be allocated, to name a few.

### D. Public Interest

Finally, Lockheed argues that a temporary restraining order will advance the public interest by maximizing the number of proposals from which the government may choose and by ensuring that the acquisition process is fair. Hughes maintains that the temporary restraining order will thwart the purpose of the consent order and increase the threat of monopoly.

**1326**

Although the public interest may be considered in determining whether injunctive relief is appropriate, *Miller v. California Pacific Medical Center*, 991 F.2d 536, 540 (9th Cir.1993), the Court concludes that a temporary restraining order will not advance the public interest. Lockheed is correct that it is in the public interest to maximize competition in federal government procurements. *See Abel Converting, Inc. v. United States*, 679 F.Supp. 1133, 1142 (D.D.C.1988). However, Lockheed's proposed relief requires that Hughes be precluded from using its sensor in its SBIRS proposal. This could require Hughes to withdraw its proposal, reducing the number of bidders. The public interest also disfavors judicial meddling in the procurement process when the party requesting injunctive relief has not shown that the nonmoving party has misbehaved.

### CONCLUSION

In light of the foregoing, Lockheed's request for a temporary restraining order is DENIED.

IT IS SO ORDERED.