DECISION
Before this Court are motions for summary judgment brought pursuant to Super. R. Civ. P. Rule 56 by Defendants Narragansett Electric Company d/b/a National Grid (Narragansett), Southern Union Company (Southern), and Thomas F. Ahern. Plaintiff, the Town of Tiverton (Tiverton), appeals a decision of the Rhode Island Division of Public Utilities Carriers (Division) which, through its Administrator Thomas F. Ahern, approved the sale of assets between Southern and Narragansett. The Defendants argue that Tiverton's appeal became moot when the sale closed in August 2006. Tiverton objects to the Defendants' motions. The Court has jurisdiction of this administrative appeal pursuant to the Administrative Procedures Act (APA), G.L. 1956 § 42-35-15.
 Facts/Travel
Southern formerly did business in Rhode Island as a natural gas distributor under the name New England Gas Company. On March 16, 2006, Southern petitioned the Division for approval of a sale to Narragansett of all Southern assets associated with the Rhode Island gas distribution business. (Report and Order of the Division of Pub. Util. Carriers, In Re Jt. Pet. for Purchase and Sale of Assets by The Narragansett Electric Company and the Southern Union Company 86, Docket No. D-06-13, July 25, 2006.) (Approval Decision.) The Division's responsibility was to determine whether the sale of the assets from Southern to Narragansett was in the public interest. See G.L. 1956 § 393-25.[1]
Tiverton intervened in the action before the Division because of concern over an issue of soil contamination located in the Town. (Approval Decision 2.) Southern is a successor to the Fall River Gas Company (FRGC), a company which operated in Massachusetts prior to a merger with Southern in 2000, and which allegedly is responsible for extensive soil contamination in Tiverton. Id. Tiverton alleged that it would not be in the public interest to approve the asset sale unless Southern was required to provide assurance, in the form of a $55 million escrow account, that Southern would pay any liability for remediation costs arising from the contamination in Tiverton. Id. at 2, 65. Southern denied that it had any liability for the contamination, and further argued that an escrow was unnecessary because it had more than adequate assets to pay any potential judgment against it. Id. at 2, 67-68. Tiverton, however, argued that the transaction was one of a series of steps designed to insulate Southern's assets from liability for remediation costs for the Tiverton site and other contaminated sites.Id. at 74.
The Division approved the sale on July 25, 2006 without requiring that an escrow account be established. Id. at 86. The hearing officer's report and order ran over eighty-five pages, and at the end of the decision, the Division's Administrator appended the following comments:
 "I did consider modifying the decision to establish an `escrow' condition on the proposed asset sale, a condition aggressively urged by some of the parties. But, after carefully considering the related evidence and arguments presented in this case, I firmly believe that the hearing officer has reached the proper conclusion on this matter. I agree that the imposition of an escrow would be an improper usurpation of authority and an intrusion into an area best left to the Courts." Id.
The Administrator then reaffirmed the decision of the hearing officer to approve the sale without an escrow condition. Id.
On August 11, 2006, Tiverton filed the complaint in this action and immediately sought a stay of the Division's Approval Decision. In a bench decision, the court denied its motion for a stay. (Stay Hr'g Tr. 31-32, Aug. 22, 2006.) "Given the thoroughness of the hearings below and the extensive decision of the hearing officer in which he had addressed testimony and evidence in exhaustive detail, it would be unconscionable of me to grant your motion. You provided no basis for it." Id. at 32. Tiverton did not seek review, via a petition for certiorari, of the denial of its petition for a stay to the Supreme Court, and the sale closed on or about August 25, 2006.
Each of Southern, Narragansett, and the Division have now moved for summary judgment, arguing that the completion of the sale has rendered the case moot. Tiverton has objected to these motions. The Defendants have chosen to proceed to summary judgment on the mootness issue alone, and have reserved their right to assert additional arguments on the merits of Plaintiff's claims if they do not prevail on the mootness issue. Plaintiff has tacitly agreed to this course of action by filing only an objection to Defendants' motions and not a cross-motion for summary judgment on the merits of their appeal. Therefore, only the mootness issue, and not the merits of Plaintiff's appeal, is before the Court at this time.
 Analysis
A case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy. See, e.g.,Foster-Glocester Reg'l Sch. Comm. v. Bd. of Review, 854 A.2d 1008, 1013
(R.I. 2004) (quotations omitted).[2] In determining whether or not this case is moot, the Court will assume arguendo that Tiverton will be successful in demonstrating that the Division's Approval Decision was erroneously granted under the appropriate standard of review.[3]See APA § 42-35-15(g) (containing the relevant standards of review). The Court must then determine whether any relief is still available to Tiverton now that the sale has closed.
Tiverton asserts that "[t]his Court has the statutory power to reverse or modify the Division's Order allowing the sale. This Court can require additional conditions be placed on the sale." (Tiverton Obj. 9.) Alternatively, Tiverton asks the Court to vacate and remand the approval in order that additional discovery be conducted to support its case that an escrow account be created, because Tiverton was allegedly denied access to certain discovery during the original proceedings. Either of these remedies surely would be appropriate prior to the sale closing under the APA. See § 42-35-15(g) ("The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision."). The Court could have vacated the Division's approval and remanded the case with instructions either to condition approval upon the creation of an escrow account,[4] or to deny approval, or to conduct additional discovery and reach an appropriate decision. See id.
Defendants argue that such relief is impossible now, after the sale closed, because the Division has lost jurisdiction over Southern. The Division has jurisdiction over "public utilities" which are companies in the business of electricity, transportation, gas, etc., and which are "operating or doing business in intrastate commerce and in this state." Section 39-1-3(20). So once Southern sold off its Rhode Island assets and ceased doing business within the state, Defendants contend that the Division lost jurisdiction over Southern.
In fact, Tiverton's counsel argued as much at the hearing before the court, where the request to stay the approval decision was denied. Tiverton's counsel argued that without a stay, the sale would close and the Division would lose jurisdiction:
 "I'm here today not to argue the merits of our appeal, but simply to preserve the status quo because this sale is supposed to go forward on Friday. Rhode Island will not have any jurisdiction. There are issues here that probably will require remand to the Division. The PUC won't have any jurisdiction over Southern Union once Southern Union sells its assets." (Stay Hr'g Tr. at 3.)
 "[I]f these conditions are not held in status quo pending our appeal, it would be unfair. There would be nothing left to appeal. The sale will have gone through with no safety conditions, no escrow and there's nothing left to appeal. There would be nothing to remand to the PUC; that would be it." Id. at 25.[5]
The Court agrees with this analysis and finds that unless Southern owns the gas distribution assets, so that it is doing business in this state, the Division has no jurisdiction over Southern. Therefore, if the Court merely vacated and remanded the Approval Decision to the Division, no purpose would be served. The Court could not order the Division to retroactively place conditions on the approval, to deny approval, or to conduct additional discovery because the Division would not have jurisdiction over Southern.
This is not the end of the analysis, however, because the Court must consider whether it has the power to order that the asset sale between Southern and Narragansett be rescinded in some fashion. If this Court found that the Division erroneously approved the sale without imposing an escrow condition, and if this Court had and exercised a power to rescind the transaction, Southern would again own the gas distribution assets and be subject to the jurisdiction of the Division on remand. In other contexts, such as fraudulent transfers, the Court has the power to avoid or rescind an otherwise complete transaction, although that power is conferred specifically by statute. See G.L. 1956 § 616-7 (allowing the Court to avoid fraudulent transfers). So in the public utility context, it is at least conceivable that the Court has the power to order the parties to "unscramble the eggs" of the asset sale in order to carry into effect a decision to vacate, remand, modify, or reverse the Division's approval. The power to issue such an injunction would be a necessary part of any relief for Tiverton.[6] If this Court does not have such power, then no relief would be available to Tiverton, its appeal would be moot, and this Court would grant summary judgment for the Defendants.
Tiverton has provided the Court with federal case law which addresses a federal court's power to order the divestiture of stock or assets following a transaction which violates the anti-trust laws. By analogy, it argues that this Court is similarly vested with power to order Narragansett to divest itself of the assets acquired from Southern. InCalifornia v. American Stores Co., the State of California sued to prevent a merger, between American Stores and one of its major competitors, which allegedly violated the anti-trust laws. 495 U.S. 271,274 (U.S. 1990). The merger between the two companies had been consummated: American Stores had bought the stock of its competitor.Id. at 276. However, pursuant to a "Hold Separate Agreement" with the Federal Trade Commission, the two companies had not integrated their operations with each other, even though as a legal matter the merger was complete. Id. at 275-76.
The trial court found that California had demonstrated a likelihood of success on the merits of their Clayton Act claim and entered a preliminary injunction. Id. at 277. It found that because the two businesses were still operating as two separate entities, there was no completed merger, and therefore, the court had the power to enjoin the merger. The Ninth Circuit Court of Appeals set aside the injunction, however, finding that the merger was already complete, that therefore the injunction was tantamount to a divestiture, and that the federal courts could not order a divestiture under § 16 of the Clayton Act.Id. at 278; see 15 U.S.C. § 26.[7] The United States Supreme Court granted certiorari to "resolve a conflict in the Circuits over whether divestiture is a form of injunctive relief within the meaning of § 16."Am. Stores Co., 495 U.S. at 275. It then proceeded to reverse the decision of the Court of Appeals because it found that a federal court could order a divestiture. Id. at 296.
The Court found that the authorization of injunctive relief in § 16 invoked the full scope of a federal court's inherent power to fashion equitable relief. Id. at 282. Even if the requested relief would be mandatory rather than prohibitive — i.e., ordering a divestiture rather than merely prohibiting the completion of a merger — the courts still had the power to order such relief. Id. at 282. Therefore, "traditional principles of equity" govern the grant of injunctive relief under § 16, and those principles authorize a divestiture when violations of the anti-trust laws are found. Id. at 495 U.S. at 281-82. "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." Id. at 295 (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944)). Therefore, unless a statute has restricted a court's jurisdiction in equity, the full scope of that jurisdiction is to be applied, and that jurisdiction encompasses ordering a divestiture. Id.
Defendants point out that there was a statutory authorization for the equitable remedy involved in Am. Stores Co., and argue that because no such statute exists in the case at bar, there is no basis for the Court to order an unwinding of the asset sale.[8] While it is true that Rhode Island lacks a specific statute authorizing equitable relief such as divestiture, like the federal courts, this Court also exercises general equitable jurisdiction. See G.L. 1956 § 8-2-13 (stating that "[t]he superior court shall, except as otherwise provided by law, have exclusive original jurisdiction of suits and proceedings of an equitable character and of statutory proceedings following the course of equity").
While this Court enjoys a broad original jurisdiction to adjudicate equitable matters, it is not clear that the Court may exercise that jurisdiction while sitting in its appellate capacity under the APA. The text of the APA defines a limited set of remedies for erroneous agency decisions: a court may "affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision." Section 42-35-15. One commentator has suggested that a statutory authorization of one remedy "may implicitly exclude all others not named in the statute." Dan B. Dobbs, Law of Remedies, 2d ed. (1993). "This is the most likely to be a fair construction when statutory remedies are extensively provided and qualified." Id.
While the Court has not found or been directed to any Rhode Island case specifically addressing this issue, courts in other states have indeed found that the specific authorization of remedies in the APA excludes other remedies. See Beizer v. Dep't of Labor, 742 A.2d 821, 831
(Conn.App.Ct. 2000) (finding that the trial court correctly dismissed a counterclaim against a plaintiff who sought judicial review of an agency decision). The Beizer Court noted:
 "[n]othing in [the Connecticut APA] gives the trial court authority to rule on a motion for summary judgment or to grant [counterclaiming defendant] the relief he sought. Although the trial court, sitting as a court of general jurisdiction, may have the subject matter jurisdiction and authority to grant [the defendant] the relief he seeks, it does not have that authority when it sits as an appellate court pursuant to the [APA]." Id.
Furthermore, in Basketfield v. Daniel, 390 N.E.2d 492, 494
(Ill.App.Ct. 1979), the Court found that the Illinois APA did not give a reviewing court jurisdiction to order back pay or restoration to the plaintiff's former job even though he was erroneously discharged).[9]But see Marquardt v. Papenfuse, 610 A.2d 325, 340 (Md.Ct.Spec.App. 1992) (upholding the trial court's issuance of an injunction in an administrative appeal because under the "extraordinary circumstances" of the case, it was justified). The Court finds that the Illinois and Connecticut interpretations of the APA are correct. If our General Assembly had seen fit to vest the Courts with broad remedial powers under the APA, it would have explicitly given that authorization. As noted above, the 1981 Model State Administrative Procedures Act contains just such an authorization, but it is not the law in Rhode Island. Without the equitable power to order the transaction rescinded, the Court is unable to fashion any relief for Tiverton because the Division would have no jurisdiction over Southern if the Court simply remanded the Approval Decision.
Moreover, even assuming arguendo that this Court has the power to issue an injunction and order Southern and National Grid to unwind the asset sale, it is unlikely this Court would make such an order. See Peckv. Jonathan Michael Builders, Inc., No. KM 06-0236, 2006 R.I. Super. LEXIS 145 at *19 to *20 (R.I.Super. Oct 26, 2006) (Silverstein, J.) (distinguishing equitable jurisdiction from equitable discretion). Merely because a court "has the power to order divestiture in appropriate cases. . . does not, of course, mean that such power should be exercised in every situation." Am. Stores, 495 U.S. at 295-96. "A private litigant . . . must have standing . . . in order to obtain relief." Id. "Moreover, equitable defenses such as laches, or perhaps `unclean hands,' may protect consummated transactions from belated attacks by private parties when it would not be too late for the Government to vindicate the public interest." Id.
Tiverton has not yet prevailed on the merits of their claim that the Division's Approval Decision was erroneous under the standards of the APA. See § 42-35-15(g). Even if Tiverton does eventually show that the approval was erroneous, it would also have to demonstrate that it is entitled to the relief it seeks under "traditional equitable principles." See Am. Stores Co., 495 U.S. at 281-82. Those principles include "balancing the equities, weighing the hardships to either side, and examining the practicality of imposing the desired relief. In addition, the complaining party must show that any legal remedy would be inadequate." Rhode Island Turnpike Bridge Auth. v. Cohen,433 A.2d 179, 182 (R.I. 1981). Whether there exists an adequate remedy at law is also sometimes formulated as a requirement that a Plaintiff demonstrate "irreparable harm." Id.
The Court can identify at least two other remedies at law of which Tiverton could have availed itself. First, if Tiverton had obtained a stay of the Division's Approval, the sale would not have closed and the appeal would clearly not be moot. Tiverton did seek a stay of the Division's decision but was unable to demonstrate entitlement to a stay. Even if the Court's denial of a stay was erroneous, though, Tiverton did not seek review of that denial in the Supreme Court for reasons that are not clear to this Court. That Tiverton had the ability to seek provisional relief, and failed, weighs against any application for injunctive relief now. Second, Tiverton could have brought an appropriate civil action against Southern for the environmental claims that form the basis of its appeal here. If Tiverton had done so while Southern had Rhode Island assets, and if it had made an appropriate showing to the Court, it could have attached a sufficient amount of those assets to satisfy any of Southern's liability.
While the attachment and stay remedies appear to be unavailable to Tiverton now, the unavailability of those remedies is due in no small part to Tiverton's own inaction. See Stay Hr'g Tr. 31:22-24 (noting that when "Tiverton essentially chose to sit on its hands during the lengthy proceedings below, it did so at its peril"). Even so, it is still possible for Tiverton to bring an appropriate civil action against Southern, obtain a judgment, and enforce that judgment against Southern's assets in other jurisdictions.[10] Therefore, the Court finds that any prejudice that may occur to Tiverton here as a result of an unfavorable ruling is unlikely to be the kind of irreparable harm that would justify equitable relief.[11]
Finally, the Court must look to the practicality of imposing the desired relief. Defendants' counsel has argued that unwinding the asset sale would be impossible at this point now that the gas operations have been inextricably integrated into Narragansett. While no affidavits or evidence have been presented regarding the extent of that difficulty and cost, the Court acknowledges that it would likely be substantial. Although it seems that the Court could require Tiverton to post a bond as a condition of obtaining the requested relief, the impracticality of unwinding the asset sale would still weigh heavily against Tiverton because a bond may not be able to compensate the harm to all the persons affected by unwinding the sale.
As noted above, the ability to order the unwinding of the asset sale is a necessary prerequisite to remanding or reversing the Division's approval — even if only for the purpose of imposing an escrow condition to the approval. Defendants would then be presented with the unenviable choice between either unwinding the asset sale or posting the required escrow — a condition that would have precluded the asset sale in the first place, according to Southern's principals. (Approval Decision 78-79.) This decision is a more difficult one than the Defendants would have faced before closing: between either abandoning the planned sale or creating an escrow. This unfairness to the Defendants would also weigh against injunctive relief.
Because the asset sale has closed, Southern is no longer doing business in Rhode Island, so simply remanding the Division's approval is not possible. Since the power to unwind the asset sale is a necessary prerequisite to granting any relief to Tiverton, and since the Court concludes that it lacks that power, the Court must find that Tiverton's appeal is moot.
 Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court grants the motions for summary judgment brought by Southern, Narragansett, and Thomas F. Ahern. Prevailing counsel may present an order consistent herewith which shall enter after due notice to counsel of record.
[1] The statute governing public utilities provides that two utilities may merge only "with the consent and approval of the division, but not otherwise." See § 39-3-24(2). If the Division is satisfied that the transaction is in the public interest, "it shall make such order in the premises as it may deem proper and the circumstances may require." Section 39-3-25.
[2] A court may also review a moot case if it raises issues of extreme public importance which are likely to recur in such a way as to evade judicial review. Foster-Glocester Reg'l Sch. Comm,854 A.2d at 1013.
[3] The Court notes Defendants' arguments that Tiverton itself did not oppose the sale in the proceedings below and therefore should not be able to oppose the sale before this Court. The Court, however, finds Tiverton's position on this point to be consistent at all phases of litigation — that the sale would be in the public interest only if
conditioned upon the creation of an escrow account. Therefore, it follows that without an escrow account, Tiverton's position is that the sale would not be in the public interest.
[4] Southern's principals, testifying before the Division, stated that if an escrow had been required, the sale would not have taken place.See Approval Decision 78-79.
[5] Although the Defendants have suggested that Tiverton should be judicially estopped from denying mootness due to counsel's assertions in the prior hearing, the Court declines to do so here. Judicial estoppel is a discretionary doctrine that prohibits a party from taking inconsistent positions on the same issue in different judicial proceedings. See D H Therapy Assocs. v. Murray, 821 A.2d 691, 693-94
(R.I. 2003). The doctrine is intended to promote truthfulness and fair dealing in judicial proceedings. Id. Tiverton's counsel suggested that the closing of the sale would deprive the Division of jurisdiction in order to obtain a stay, and the Court agrees with this proposition. However, counsel did not specifically contend that the case would be moot if the stay was denied, and the argument at the stay hearing did not address whether the Court could order the sale to be rescinded after the sale closed. Therefore, while it is a close issue, the Court will allow Tiverton to maintain its position on mootness and will not find estoppel here.
[6] Before the Division, Tiverton urged that approval be conditioned upon posting an escrow account, which would give Southern and Narragansett the choice of posting the escrow or abandoning the sale. Before the Division, Southern's principals testified that an escrow condition would cause the sale to be abandoned. (Approval Decision 78-79.) Now that the sale has closed, Tiverton urges this Court simply to order Southern to post an escrow account. The Court finds that to "retroactively condition" the sale upon the posting of an escrow would be unfair. At most, this Court would fashion an order requiring Defendants to choose between posting the escrow and unwinding the sale.
[7] Section 16 provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings." 15 U.S.C. § 26 (2006).
[8] Section 16 of the Clayton Act specifically authorizes individuals to bring suit for injunctive relief for violations of the anti-trust laws "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings." 15 U.S.C. § 26.
[9] The Illinois and Connecticut versions of the pertinent APA section are based upon the same 1961 model act issued by the Uniform Law Commissioners — the same model act upon which the Rhode Island APA is based. Model State Administrative Procedures Act, 1961 Act, (Uniform Laws Annotated, vol. 15, 174) (Table of Jurisdictions). In 1981, the Commissioners issued a new model act. The 1981 version contains a much broader set of remedies for a reviewing court, specifically allowing a court to compel agency action, set aside or modify agency action, remand the matter to the agency, or grant "other appropriate relief, whether mandatory, injunctive, or declaratory; preliminary or final; temporary or permanent; equitable or legal." Model State Administrative Procedures Act, 1981 Act (U.L.A.) § 5-117.
[10] There is nothing in the record indicating that Tiverton has ever brought or has imminent plans to bring a civil action for its environmental claims.
[11] The Court acknowledges the argument Tiverton made before the Division that Southern is attempting to restructure its business to shield its assets from environmental liability. The Court will not address this argument now because it goes to the merits of Tiverton's appeal and the parties have not briefed it. However, the Court points out that in order to obtain injunctive relief, Tiverton would have to demonstrate that the aforementioned remedies are inadequate. (Approval Decision 74.)